## IN THE SUPREME COURT OF TENNESSEE
### AT JACKSON

**FOR PUBLICATION**

STATE OF TENNESSEE,        )    **Filed:  March 23, 1998**

          Appellee,     )

                      )    GIBSON CRIMINAL

                      )    (Transferred from Montgomery Co.)

v.                  )

                      )    HON.  DICK JERMAN, JUDGE

RONNIE MICHAEL CAUTHERN,    )

                      )

          Appellant.    )    No. 02-S-01-9612-CC-00108

**FILED**

**March 23, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

**For Appellant:**
Hugh R. Poland, Jr.
POLAND & POLAND
Clarksville, Tennessee

Robert T. Bateman
BATEMAN, BATEMAN
 & DARNELL, P.C.
Clarksville, Tennessee

**For Appellee:**
John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

John P. Cauley
Assistant Attorney General
Nashville, Tennessee

**At Trial:**
Clayburn Peeples
District Attorney General
Trenton, Tennessee

John Carney
District Attorney General
Clarksville, Tennessee

Steve Garrett
Assistant District Attorney
Clarksville, Tennessee

# O P I N I O N

CONVICTION AND SENTENCE
OF DEATH AFFIRMED.               ANDERSON, C.J.

This case is before the Court for automatic review of the Court of Criminal Appeals' affirmance of a conviction for first-degree murder and a sentence of death imposed upon the defendant, Ronnie M. Cauthern, in a Gibson County resentencing hearing.[1] In addition to the death sentence imposed for the murder of Rosemary Smith, the jury returned a life sentence for the murder of Patrick Smith. In imposing the death sentence, the jury found that the evidence of one aggravating circumstance, "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," outweighed the evidence of mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204(g) and (i)(5)(1991).

Although the defendant's 1988 convictions for first-degree murder were affirmed on direct appeal by this Court, the case was remanded for resentencing because the trial court failed to suppress portions of a statement given by the defendant after he rescinded his waiver of the Fifth Amendment right to remain silent. State v. Cauthern, 778 S.W.2d 39 (Tenn. 1989), cert. denied 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990). In the 1988 Clarksville trial, the defendant was convicted of murdering Patrick and Rosemary Smith in the perpetration of a felony.[2] The jury imposed the death sentence for both murders after finding that the evidence of two aggravating circumstances, the murders were "especially heinous, atrocious or cruel, in that [they] involved torture or depravity of mind," and the murders were committed during the perpetration of a felony, outweighed the

---

[1] "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right to direct appeal from the trial court to the court of criminal appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the court of criminal appeals, the clerk shall docket the case in the supreme court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure." Tenn. Code Ann. § 39-13-206(a)(1)(Supp. 1996).

[2] The defendant was also convicted of first-degree burglary, for which he was sentenced to ten years, and aggravated rape, for which he was sentenced to forty years; the forty-year sentence is to run consecutively to the death sentence. A co-defendant, Brett Patterson, received a life sentence for each murder.

evidence of any mitigating factors.[3]  After a remand for resentencing, the Clarksville

trial court granted a motion for change of venue to Gibson County, Tennessee.

The defendant alleges that a number of errors occurred in the resentencing

hearing in the Gibson County trial court, including but not limited to the sufficiency of

the evidence and the jury instruction as to the heinous, atrocious or cruel

aggravating circumstance, the jury instruction as to the penalty of life without parole,

prosecutorial misconduct, and whether the death penalty was disproportionate.

After reviewing the record, the issues raised, and the Court of Criminal Appeals'

opinion, we have determined beyond a reasonable doubt that none of the alleged

errors affected the sentence imposed by the jury; moreover, the evidence supports

the jury's sentence of death and the sentence is not disproportionate or arbitrary as

applied to the defendant.  Accordingly, we affirm the sentence of death by

electrocution.

## FACTUAL BACKGROUND

A summary of the State's evidence offered at the resentencing hearing

begins on the morning of January 9, 1987, when police responded to a "burglary in

progress" at the home of Patrick and Rosemary Smith in Clarksville, Tennessee.

Upon arriving at the Smiths' home, the police discovered that a back door had been

kicked in, a window had been broken, and the phone lines had been severed.

Inside, police discovered the body of Patrick Smith partially lying across the

bed in the master bedroom; abrasions and marks on his neck indicated that he had

been strangled. The body of Rosemary Smith was discovered in another bedroom;

her underclothes were next to her body and her nightgown was in the corner of the

---

[3] Tenn. Code Ann. § 39-2-203(i)(5) & (7)(1982)[Now Tenn. Code Ann. § 39-13-204(i)(5) & (7)(1991 & Supp. 1996)].

room.  A scarf had been tied around her neck and knotted, with a small vase inserted between the nape of the neck and the knot, creating a tourniquet.

The master bedroom was in disarray, indicating that a violent struggle had taken place.  The bedrail had splintered away from the headboard and the mattress was on the floor.  Credit cards, electronic gear and a videocassette recorder appeared to be missing from the house.  Police found costume jewelry in the house, but no jewelry of value.  A slip of paper containing the name of the defendant, Ronnie Cauthern, was also found.

The medical examiner, Dr. Charles Harlan, concluded that the victims died of ligature strangulation.  Neither victim died instantaneously and could have lived for as much as three to six minutes from the time the blood supply was cut off; however, they may have been rendered unconscious in approximately thirty seconds. There was evidence that someone had unsuccessfully attempted to strangle Rosemary Smith with the scarf, and finally accomplished the strangulation by using a vase as a tourniquet to increase pressure.  The medical examiner also found evidence that Rosemary Smith had attempted to relieve the pressure on her neck when the strangulation instrument was being applied.  There were abrasions on her neck and face, and the thyroid cartilage surrounding her larynx had been fractured.

In addition to the foregoing, other evidence offered at the resentencing hearing was as follows.  James Phillip Andrew testified that he was with the defendant, Ronnie Cauthern, and Brett Patterson shortly after the offenses.  While watching television, they all saw an account of the Smiths' murders in which a reward was offered for information.  Cauthern told Andrew that he had worked for the Smiths in the past and that he broke into their home and made the woman get into the closet, while he and Patterson strangled the man.  Cauthern told Andrew

that he raped the woman once and that he had stolen a wedding ring, a VCR, and some credit cards. Andrew testified that Cauthern seemed proud of what he had done, and that he threatened to kill Andrew if he repeated anything about the murders.

Joe Denning, Andrew's roommate, also testified that Ronnie Cauthern admitted his role in the killings. Cauthern told Denning that he had cut the telephone lines to the house, had broken in through the back door, had shined flashlights in the victims' faces in order to wake them, and had placed Rosemary Smith in a closet. He admitted to Denning that he had raped the woman and poured wine coolers over her,[4] and then attempted to kill her. He said he tried to strangle the woman by tying a scarf around her neck, but did not have the strength to kill her, so he used the vase to create a tourniquet. Denning testified that Cauthern's demeanor was "hyper" and "excited" when he related what he and Patterson had done. He said that he was going to be famous and that he would not be caught alive. He showed Denning credit cards, a checkbook, and some stolen jewelry which he intended to give to his girlfriend.

Cauthern's former girlfriend, Jackie Pigue, testified that on Thursday night, January 8, 1987, Cauthern and Patterson were "solemn" and "quiet." The next day Cauthern gave her a watch and a wedding ring. He told her that someone owed him money and he was holding the items as collateral. When she later saw a news report regarding the murders and Cauthern's arrest, she went to the police and gave them the jewelry.

Cauthern and Patterson were arrested on January 12, 1987. Search warrants were obtained for Cauthern's car and Patterson's house. Among the items

---

[4] There was evidence of a wet, cloudy substance on the bed in which Mrs. Smith was found, as well as on Mrs. Smith's face and thigh. Police also discovered two bottle caps from wine coolers in the hallway outside the bedroom.

found were the victims' credit cards, identification cards, receipts, checks and two key rings containing keys which unlocked the Smiths' home and automobiles. The police also found two ski masks, several handguns, a roll of 880 military cord, and Patrick Smith's jacket.

Initially, Cauthern gave several statements to the police, all of which were admitted into evidence at the sentencing hearing. In the first statement, he denied knowing the Smiths or anything about the murders. In a later statement, which was recorded and transcribed, Cauthern admitted that he was in the Smiths' home, but denied that he had raped or murdered anyone. Claiming that he and Mrs. Smith were having an affair, he contended that she had called and invited him to come to the Smith house and enter through the back door. He said that both he and Patterson had consensual sex with Mrs. Smith, and he denied that he participated in the murders, raped the victim, or removed any items from the house.

In the mitigation portion of the resentencing hearing, Cauthern testified that he was nineteen years old at the time of the murders. He stated that he never knew his birth father and saw his birth mother approximately three times during his entire life. His birth mother died, and he was adopted by his maternal grandmother and step-grandfather who moved to Clarksville in 1973. The defendant attended Northeast High School, but dropped out to care for his grandmother who had Parkinson's disease, so that his step-grandfather could continue to work. He was married at the age of eighteen and at the time of the hearing, had an eight-year-old son. Although he had divorced his son's mother, he continued to see his son every three to five months. Since his incarceration he had remarried. His wife, who lived in Canada, was not at the hearing. He testified that he helps his parents by writing letters for them.

Cauthern also said he had completed the Graduate Equivalency Examination and a paralegal course since being incarcerated, and he serves as a teacher's aide to the unit prison teacher. He has achieved "A" status at Riverbend Maximum Security Institution for privilege purposes, which is the highest status available for a prisoner. He introduced letters of appreciation from a correctional officer and the prison teacher. A Unit Review Panel Hearing form containing positive comments concerning his behavior and attitude was also introduced. He makes extra money by drawing greeting cards and selling them to other prisoners. Charles Tracy, a teacher for the Department of Correction, testified that he chose Cauthern as a teacher's aide because he gets along well with others and has good communication skills.

## JURY INSTRUCTION - AGGRAVATING CIRCUMSTANCE (i)(5) - TORTURE

The defendant first argued that the jury instruction as to Tenn. Code Ann. § 39-13-204(i)(5)(1991) - the heinous, atrocious, or cruel aggravating circumstance - was reversible error because the 1989 amendment was instructed to the jury rather than the statute as it existed at the time of the offense in 1987.

At the time of the offense, the aggravating circumstance set out in Tenn. Code Ann. § 39-2-203(i)(5)(1982) provided that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." In 1989, the statute was amended to provide as follows: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1991). At the resentencing hearing, the trial judge instructed the jury in accordance with the 1989 amendment, rather than in accordance with the statute as it existed in 1987 at the time the offense was committed. Neither the defendant nor the State objected at trial.

This Court has decided that a resentencing hearing must be conducted in accordance with the law in effect at the time of the offense. State v. Brimmer, 876 S.W.2d 75, 82 (Tenn.), cert. denied, 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994). We have also held that the 1989 amendment to aggravating circumstance (i)(5) is "a substantive change which imposes not a different level of proof upon the State, but different factors of proof." State v. Bush, 942 S.W.2d 489, 505 (Tenn.), cert. denied, ___ U.S. ___, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997). Obviously, the amended version substitutes the phrase "serious physical abuse beyond that necessary to produce death," for the words "depravity of mind." It is therefore obvious that the trial judge committed error in charging the jury with the 1989 version of the statute, rather than the statute as it existed at the time of the commission of the offense in 1987. Id.

Assuming there is error, as we must, the next question is whether the error is harmless. We faced a similar position in Bush, a case where the victim was beaten and stabbed forty-three times in the face, neck, shoulders, and chest. Although the offense occurred before 1989, the trial court committed error by instructing the jury as to the law as changed in 1989, i.e., that the appropriate aggravating circumstance was set out in Tenn. Code Ann. § 39-13-204(i)(5), "torture or serious physical abuse beyond that necessary to produce death," instead of Tenn. Code Ann. § 39-2-203(i)(5), "torture or depravity of mind." In spite of the error, we held that the defendant's treatment of the victim constituted "torture," independent of the depravity prong in -203(i)(5) or the serious physical abuse prong of -204(i)(5). Moreover, we found that the evidence was sufficient to establish "depravity of mind" beyond a reasonable doubt, even though the jury was not instructed with regard to the definition of "depravity of mind." Accordingly, we held that the trial court's error in failing to instruct on the pre-1989 version of the aggravating circumstance was harmless beyond a reasonable doubt. Id. at 506.

Following the Bush analysis, we must review the evidence in this case to determine whether it is sufficient to support the "torture" prong of the aggravating circumstance, independent of the depravity or serious physical abuse prong. In this case, the trial court correctly instructed the jury as to the terms "heinous, atrocious," and "cruel" as defined in State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). The trial judge also correctly instructed the jury that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Id. at 529.

Applying these principles, we find that there is sufficient evidence in this record to establish the torture factor under Tenn. Code Ann. § 39-2-203(i)(5) or Tenn. Code Ann. § 39-13-204(i)(5), independent of the depravity or serious physical abuse prongs of the aggravating circumstances. The victim, Rosemary Smith, was placed in a closet, first enduring the mental anguish of her husband's murder in the next room. She then was raped twice, ridiculed, suffered through a bungled attempt at strangulation and strangled to death with a tourniquet device placed around her neck that caused massive damage to her throat and larynx. There was evidence that the victim struggled to save herself while still alive and conscious by attempting to release the pressure which was applied to her neck. After the blood supply was finally cut off at the end of the struggle, she may have lost consciousness in thirty seconds but remained alive for three to six minutes. See, e.g., State v. Hodges, 944 S.W.2d 346 (Tenn.), cert. denied, ___ U.S. ___, 118 S.Ct. 567, ___ L.Ed.2d ___ (1997) (mental and physical pain suffered by victim of strangulation constituted torture). Thus, we conclude that the proof of torture establishes beyond a reasonable doubt that the jury would have sentenced the defendant to death, even had no weight been given to the invalid criteria of "serious physical abuse."

We also determined in Bush that had the jury been properly instructed, it would have found the evidence sufficient to establish depravity of mind beyond a

reasonable doubt. "[D]epravity is inherent in the state of mind of a murderer who willfully inflicts severe physical or mental pain on a victim prior to death or at a time very close to the victim's death." Bush, 942 S.W.2d at 506; Williams, 690 S.W.2d at 529. The evidence outlined above is sufficient to conclude in this case that had the jury been properly instructed regarding depravity of mind, it would have found the evidence sufficient to establish this factor. See also State v. O'Guinn, 709 S.W.2d 561 (Tenn.), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986) (ligature strangulation constituted depravity of mind).

### SUFFICIENCY OF EVIDENCE TO SUPPORT DETERMINATION THAT MURDER WAS "HEINOUS, ATROCIOUS OR CRUEL"

In addition to the instructional error claimed, the defendant argues that the proof is insufficient to support the "heinous, atrocious or cruel" aggravating circumstance and is insufficient to support a finding that this lone factor outweighs the mitigating circumstances presented in this case.[5] The defendant contends that the evidence implicated his co-defendant as the actual murderer and that the evidence failed to show "torture" because the victim lost consciousness thirty seconds into the act of killing her. The defendant also relies on State v. Odom, 928 S.W.2d 18 (Tenn. 1996), in which a majority of this Court found the evidence insufficient to support this aggravating factor. We reject each of these contentions.

The evidence established that the defendant Cauthern was a major participant in the crimes.[6] Cauthern and his co-defendant kicked in the door to the

---

[5] When this offense was committed, Tenn. Code Ann. § 39-2-203(g) required the jury to find that no mitigating factors were sufficiently substantial to outweigh the statutory aggravating circumstance. The trial court here charged the jury with the statute as amended in 1989, which provides that the jury must find that the aggravating circumstances proven by the State outweigh any mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204 (g)(1)(B)(1991). Obviously, the 1989 version is more favorable to the defendant.

[6] In Tison v. Arizona, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), the Supreme Court held that the Eighth Amendment to the United States Constitution does not prohibit imposition of the death penalty where a defendant is a major participant in a felony, and his mental state is one of reckless indifference to human life. See also State v. Branam, 855 S.W.2d 563 (Tenn. 1993).

victims' home in the middle of the night and cut the phone lines. They woke

Rosemary Smith and the defendant placed her in a closet while her husband was

murdered in the next room. The defendant raped the victim, poured alcohol on her,

and attempted to strangle her to death, an act that ultimately required the use of a

tourniquet. Although the victim may have lost consciousness in thirty seconds, there

was evidence of an earlier unsuccessful attempt at strangulation after which a vase

was used as an aid to increase pressure on the neck before the blood supply was

finally cut off. Other evidence demonstrated that she tried to relieve the pressure on

her neck as her larynx was being crushed and that she survived for three to six

minutes after the blood supply was cut off.

The evidence of torture in this case is remarkably similar to State v. Hodges,

supra. There the victim was bound and handcuffed to a bed while the defendant

ransacked his home for property and money. After discussing with a co-defendant

whether the victim should be killed, the defendant strangled the victim to death. As

to the torture prong, we commented and held:

> [T]he victim suffered considerable mental pain as the defendant, along
> with [a co-defendant], ransacked his home, looking for valuable
> property and money. The helpless victim's mental pain, no doubt,
> increased when the defendant and [a co-defendant] . . . discussed
> whether or not they should kill the victim. The evidence surrounding
> the murder itself shows that the victim pleaded . . . for his life. Dr.
> Harlan testified that the killing would have taken between three to five
> minutes to accomplish and that the victim would have been conscious
> for most of this period. [The co-defendant] testified that she heard the
> victim moaning and making a choking sound. The facts and
> circumstances surrounding this murder, including the strangulation, are
> clearly sufficient to establish torture as that term has been defined . . .
> and to support the jury's finding that this murder was heinous,
> atrocious, or cruel, in that it involved torture or serious physical abuse
> beyond that necessary to produce death.

944 S.W.2d at 358 (emphasis added); see also State v. Shepherd, 902 S.W.2d 895

(Tenn. 1995)(asphyxiation and suffocation of victim constituted (i)(5)); State v.

Johnson, 743 S.W.2d 154 (Tenn. 1987), cert. denied 485 U.S. 994, 108 S.Ct. 1303,

99 L.Ed.2d 513 (1988)(suffocation, taking four minutes for victim to die, was sufficient to prove (i)(5)). Accordingly, we conclude that the evidence was sufficient to support the jury's finding of this aggravating circumstance under the facts of this case.

In making this determination, we distinguish this case from State v. Odom, which is relied upon by the defendant. In Odom, the defendant accosted the victim, stabbed her three times, raped her, and took her purse. A majority of this Court found that the circumstance of that rape did not constitute torture and that, according to the majority, such a holding would have permitted every murder in the perpetration of a rape to be automatically classified as a death eligible offense and would not narrow the class of death eligible offenders as required by the Eighth Amendment to the United States Constitution and Article I, § 16 of the Tennessee Constitution. In contrast, the defendant in the present case was also convicted of first-degree burglary, which, when coupled with the murder of the victim's husband, the multiple rapes and strangulations of the victim, and the other evidence of torture as outlined above, not only is sufficient to prove the aggravating circumstance but also serves to narrow the class of death eligible offenders and distinguish this case from Odom. Thus, Odom does not support the defendant's argument that the evidence was insufficient to support this aggravating circumstance.

Finally, the jury was instructed to consider several statutory mitigating factors: 1) the defendant had no significant criminal history; 2) the murders were committed while the defendant was under the influence of extreme mental or emotional disturbance; 3) the youth of the defendant; 4) the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense as a matter of law but which substantially affected his judgment through the ingestion of drugs; and 5) any other

mitigating evidence which was raised by the evidence. See Tenn. Code Ann. § 39-13-204(j)(1991). The trial court also instructed the jury on several nonstatutory circumstances: 1) the defendant was an enterprising young man at the time of the crimes; 2) the defendant has a minor child; and 3) the defendant is married.[7] The jury found beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstances in this case, and, as discussed above, the evidence was sufficient to support this finding.

## LIFE WITHOUT POSSIBILITY OF PAROLE - JURY INSTRUCTION

The defendant also contends that the trial court erred by not instructing the jury that life without the possibility of parole was a possible punishment. The State responds that the punishment of life without the possibility of parole was statutorily inapplicable to the defendant's case and that the defendant expressly asked the trial court not to charge it. We agree with the State that the defendant has clearly waived this issue, but we also find that the option was unavailable to the defendant in this case.

Prior to 1993, the only punishments available for a person convicted of first-degree murder were life imprisonment or death. Tenn. Code Ann. § 39-13-202(b)(1991). The legislature later amended the statute to add life without possibility of parole as a sentencing option. Tenn. Code Ann. § 39-13-202(c) (Supp. 1996). The amendment was specifically made applicable to offenses committed on or after July 1, 1993. See 1993 Tenn. Pub. Acts, ch. 473, § 1.

Conceding that this offense occurred well before July 1, 1993, the defendant argues that life without parole was a viable sentencing alternative because of Tenn.

---

[7] The trial court instructed the jury on the law as to mitigating circumstances as amended in 1989, which requires instructions on statutory and also non-statutory factors if raised by the evidence and specifically requested. See Odom, 928 S.W.2d at 30. The statute at the time of this offense required instructions only on statutory mitigating factors raised by the evidence. Tenn. Code Ann. § 39-2-203(e)(1982)[now Tenn. Code Ann. § 39-13-204(e)(1991)]. Again, the difference in the instructions favored the defendant.

Code Ann. § 39-13-204(k)(Supp. 1996), which provides that if a defendant is granted a new trial, "either as to guilt or punishment or both, the new trial shall include the possible punishments of death, imprisonment for life without possibility of parole or imprisonment for life."  Because life without parole is a lesser penalty than death, the defendant also relies upon Tenn. Code Ann. § 39-11-112 (1991), which provides:

> Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.  Except as provided under the provisions of § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

(Emphasis added).

First, the defendant clearly waived this issue prior to trial when he filed a motion in which he specifically requested that the trial court "not . . . submit to the jury the possible sentence of 'Life Without Parole.'"  Comments prior to jury selection by the trial court and counsel make it abundantly clear that the defendant did not want the jury to be charged on the option of life without the possibility of parole.  Furthermore, there is no indication that the State objected to this procedure.  Under these circumstances, the issue is waived.  Tenn. R. App. P. 36(a).  Nevertheless, we will address the issue on the merits to provide further guidance on these statutory provisions.

This Court's role in construing a statute is to determine and to "give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope."  Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995).  We must determine the legislative intent from the plain language of the statute,

"read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning." State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997). As a matter of statutory construction, a specific statutory provision will control over a more general statutory provision. Matter of Harris, 849 S.W.2d 334, 337 (Tenn. 1993). Moreover, a statute is generally presumed to operate prospectively, unless the legislature indicates a specific intention otherwise. Brimmer, 876 S.W.2d at 82.

We conclude that the specific enabling provision of the 1993 act, which clearly states that the amendment applies to all offenses committed on or after July 1, 1993, controls, as a matter of statutory construction, over the more general provisions of Tenn. Code Ann. § 39-13-204(k) or Tenn. Code Ann. § 39-11-112. The defendant's crime occurred well before July 1, 1993. The statute in effect at that time, Tenn. Code Ann. § 39-2-203(k), provided that upon the grant of a new trial, the available sentencing options were life imprisonment and death. There is no indication that the legislature intended that the option of life without parole apply retrospectively to offenses occurring before July 1, 1993. See, e.g., White v. State, 589 A.2d 969, 974 (Md. Ct. App. 1991)(trial judge lacked authority to charge the jury on life without parole because the offense was committed prior to the effective date of the statute adding the sentencing option). Accordingly, even had the defendant not waived this issue, the trial court lacked the statutory authority to instruct the jury that life without possibility of parole was a sentencing option in this case.

**PROSECUTORIAL MISCONDUCT**

The defendant next argues that prosecutorial argument led to arbitrary and unreliable sentencing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 16 of the Tennessee Constitution. Contending that the prosecutor's references to him as "the evil one," comparing him to other notorious murderers, and calling for general deterrence prejudiced the jury,

the defendant asserts that these errors required a new sentencing hearing.  To

place the issue in context, we recite the relevant portion of the closing argument:

Yes, we are asking for the death penalty.  Why? Why should Ronnie Cauthern die?  I once heard an interpretation of the Lord's Prayer.  "Deliver us from evil," originally translated and actually read, "Deliver us from the evil one"--far more personally [sic], far more graphic, and far more intense--the evil one.

In the 1960's, the Rolling Stones came out with a song. The refrain after each chorus was, "Pleased to meet you. Hope you guess my name."  And, I suggest to you it was a song about the evil one appearing in person throughout the ages in many different guises.  Mr. Poland says civilized society--in civilized society, we don't kill.  But in civilized society, we must address--we must stand up to, we must confront the realities of our daily existence and our daily survival not only of ourselves but of our children and their children.

It came to dawn on me after I thought about, "Pleased to meet you, hope you guess my name"--that on January 8th and January 9th, 1987, the evil one descended upon Patrick and Rosemary Smith, and the evil one is smart, the evil one is skilled, the evil one is wily, and the evil one is manipulative.  A simple little demonstration of that, ladies and gentlemen, is this.  The evil one appeared today and produced greeting cards--"Merry Christmas," "Happy Holidays."

But on January the 8th, 1987, the evil one appeared at the door of 351 Hampshire Drive, a home not unlike yours in a neighborhood not unlike yours--the evil one appeared there in disguise--a mask, a black jacket, a pistol, strangling rope, and the evil one is capable of taking advantage of what was available inside their house.

Yes, whether you like it or not--whether you volunteered or not, you are engaged in the ultimate battle in everyday combat with the evil one, and he's not going to go away. He appeared in Minnesota in the form of Jeffrey Dahlmer [sic].  He appeared in Union, South Carolina, and on January the 9th, he appeared in the door of Patrick and Rosemary Smith.  You cannot negotiate with the evil one, ladies and gentlemen.  You cannot deal in good faith with the evil one.  You have got to destroy and destroy, or he and his benefactors will destroy you.  He'll destroy us. He'll destroy our children.

The evil one took the name of Ronnie Cauthern on that day.  That was his name, and he's beyond redemption. He's beyond rehabilitation.  There is no treatment for this individual posing in a mask and taking human form.

> There is no treatment for this person. This person has
> been around through the ages and will appear again.
> You cannot cure him. Don't try to save him. Engage him
> in combat and destroy him. Do your duty. When you
> open that paper and you find that the State has carried
> out your instruction, you will have scaled the ramparts at
> least one time, and you will have been a part of bringing
> back peace and tranquility in your community and in our
> community, and you will send a message to the evil one.
> You will send a message that we stand ready--armed,
> and ready to fight for all in the world, for everything that
> you believe in, for the sanctity of your home, the blessing
> of seeing your children reach adulthood and have your
> grandchildren, and you will take that step and leave a
> legacy to your children that they someday will not have to
> grapple with what the Smiths had to deal with and what
> Karen Rivetna and her mother have to deal with.
>
> "Holiday Greetings"--a time for loved ones to get
> together. Horrible chaos has been reaped and racked on
> this family. I'm asking you to do your duty. Stand tall.
> Thank you.

We have recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994). Nonetheless, closing argument is subject to the discretion of the trial judge, and must be temperate, predicated on evidence introduced during the trial, and relevant to the issues being tried. State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

Here, it is evident that the prosecutor's argument, in several respects, violated these well-established standards. First, the prosecution's reference to the Lord's Prayer and its requests for the jury to "combat and destroy" the "evil one," amounted to the use of biblical passages that the Court repeatedly has held to be improper and inflammatory. State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994); State v. Bates, 804 S.W.2d 868, 881 (Tenn.), cert. denied 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (1990). Second, the frequent references to the defendant as the "evil one," used as epithets to characterize the defendant, were also improper and potentially appealed to the bias and passion of the jury. Darden v. Wainwright, 477 U.S. 168, 179, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)("animal");

-17-

Bates, 804 S.W.2d at 881 ("rabid dog").  Third, the statements that the jury should

"do its duty" and that its verdict should send a message to the community

constituted a plea for general deterrence, which we have held has no application to

either aggravating or mitigating factors.  Keen, 926 S.W.2d at 737; State v. Irick, 762

S.W.2d 121, 131 (Tenn. 1988), cert. denied, 489 U.S. 1072, 109 S.Ct. 1357, 103

L.Ed.2d 825 (1989).  Finally, the argument impermissibly suggested to the jury that

the defendant, as an incarnation of "the evil one," should be sentenced to death not

only for the offense charged but also for other heinous offenses committed by "the

evil one" in the form of other notorious murderers.  Cf. Bigbee, 885 S.W.2d at 812

(argument that imposition of the death penalty in the cases before the jury would be

an appropriate way to punish defendant for other crimes he had committed is

improper).  In summary, we find that the State's argument was highly improper.


Where argument is found to be improper the established test for determining

whether there is reversible error is "whether the improper conduct could have

affected the verdict to the prejudice of the defendant."  Harrington v. State, 215

Tenn. 338, 385 S.W.2d 758, 759 (1965).  We must consider:  1) the conduct

complained of, viewed in light of the facts and circumstances of the case;  2) the

curative measures undertaken by the court and the prosecution;  3) the intent of the

prosecutor in making the improper statement;  4) the cumulative effect of the

improper conduct and any other errors in the record;  and 5) the relative strength or

weakness of the case.  Bigbee, 885 S.W.2d at 809; State v. Buck, 670 S.W.2d 600,

609 (Tenn. 1984).


Application of these factors indicates that the argument, while highly

improper, did not affect the verdict to the prejudice of the defendant.  The remarks in

question were only a portion of the prosecutor's summation.  Although no curative

measures were taken by the trial court or the prosecution, this was primarily

because the defense failed to object.[8]  We suggest, however, that this is a case in which the *sua sponte* intervention by the trial court would have been appropriate. See <u>Sparks v. State</u>, 563 S.W.2d 564, 567 (Tenn. Crim. App. 1978).  It appears that the prosecution's motivation in making the argument was to respond to defense counsel's assertion that the defendant should not receive a death penalty in a civilized society and also to rebut the defendant's evidence of his rehabilitative potential.  Finally, the misconduct must be viewed together with the overall record and the overwhelming strength of the State's case.  The evidence supported the aggravating factor relied on by the State, as well as a finding that this factor outweighed the evidence of mitigating factors.

Accordingly, while we find that the prosecution's argument was patently improper and caution prosecutors against similar argument in the future, we nevertheless hold that in this case, the argument did not affect the sentence or render the jury's decision arbitrary or unreliable under the Eighth and Fourteenth Amendments to the United States Constitution or Article I, §§ 8 and 16 of the Tennessee Constitution.

### EXCLUSION OF MITIGATION EVIDENCE

The defendant argues that the trial court committed reversible error by excluding evidence offered in mitigation, specifically, a note written to the defendant by his son, which read:

> Dear Dad,
>
> I Love you Dad.  I hope I come again gen [sic].
> Some time.  we went to Chuck [sic] Cheese.  We went to
> Wall [sic] Mart and we had fun.
>
> Love always, Ryan

---

[8] We note, however, that the prosecutor began his rebuttal by discussing the videotape of the murder scene.  When the defense objected to the scope of the rebuttal, the prosecutor stated that he "intend[ed] to make it relevant to counsel's remarks . . ."  The trial court overruled the objection.  The prosecutor then launched into the argument set forth above.  No further objections were made.

The trial court excluded the letter, finding that it was of negligible probative value and was cumulative to the other evidence presented. The State contends that the ruling was not an abuse of the trial court's discretion.

The United States Supreme Court has repeatedly held that the Eighth and Fourteenth Amendments to the United States Constitution require states to allow the sentencer in a death penalty case to consider mitigating evidence. McKoy v. North Carolina, 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990). Mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Accordingly, "states cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty." McCleskey v. Kemp, 481 U.S. 279, 306, 107 S.Ct. 1756, 1761, 95 L.Ed.2d 262 (1987).

We have also stressed that Article I, § 16 of the Tennessee Constitution requires that the jury not be precluded from hearing evidence about the defendant's background, record, and character, and any circumstances about the offense that may mitigate against the death penalty. Odom, 928 S.W.2d at 30; State v. Teague, 897 S.W.2d 248, 255 (Tenn. 1995). Similarly, the statutory scheme in effect at the time of this offense provided:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received. . . .

Tenn. Code Ann. § 39-2-203(c)(1982)[now Tenn. Code Ann. § 39-13-204(c)(Supp. 1996)]. The statute also contained specific statutory mitigating factors including, "any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing." Tenn. Code Ann. § 39-2-203(j)(1982)[now Tenn. Code Ann. § 39-13-204(j)(Supp. 1996)].

In light of these controlling principles, it is our view that the trial court erred in excluding the letter written to the defendant by his son. The defendant's family and young son who have expressed love and support are arguably relevant to the defendant's background and character, and a potential basis upon which a juror could decline to impose the death penalty. Although constitutional and nonconstitutional error is a line frequently blurred, the exclusion of mitigating evidence potentially undermines the reliability of the sentencing determination, and is an error of constitutional magnitude. See Skipper v. South Carolina, 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986). Thus, the burden is on the State to prove that the error did not affect the verdict and, therefore, was harmless beyond a reasonable doubt. Satterwhite v. Texas, 486 U.S. 249, 258, 108 S.Ct. 1792, 1798-1799, 100 L.Ed.2d 284 (1988); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

A review of the record reveals that the essence of the excluded evidence was presented to the jury in other forms. The defendant testified that he had an eight year old son who visited him every three to five months. A photograph of the defendant with his son was introduced into evidence in mitigation. Based on this evidence, the trial court instructed the jury that it could consider the fact that the defendant has a minor son as a non-statutory mitigating factor.[9] Accordingly, we

---

[9] As discussed earlier, the statute in effect at the time of this offense did not require the trial court to charge the jury on non-statutory mitigating factors.

conclude that the error in excluding this evidence did not affect the jury's verdict and was harmless beyond a reasonable doubt.

## PROPORTIONALITY ANALYSIS

The defendant argues that his sentence is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. A statutory comparative proportionality review, which we must undertake pursuant to Tenn. Code Ann. § 39-2-205(c)(4)(1982) [now Tenn. Code Ann. § 39-13-206(c)(4)(Supp. 1996)], "presupposes that the death penalty is not disproportionate to the crime in the traditional sense [and] purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, ___ S.W.2d ___ (Tenn. 1997)(quoting, Pulley v. Harris, 465 U.S. 37, 42, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984)). Although not constitutionally required, comparative proportionality review "serves as an additional safeguard against arbitrary or capricious sentencing." Bland, ___ S.W.2d at ___; see Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

In Bland, we identified two approaches to statutory comparative proportionality review: the frequency method, which employs a statistical analysis to identify the various factors leading to the imposition of the death penalty and the frequency with which the punishment is imposed in similar circumstances; and the precedent seeking method, which compares the case at issue with other cases in which defendants were convicted of the same or similar crimes. We have consistently employed the precedent method under our statutory scheme, and the method, while not rigid or objective, serves the essential purpose of "identifying aberrant sentences." Id. at ___.

Although no crimes are precisely alike in the applicable pool of cases, i.e., those in which a capital sentencing hearing is held, we have identified numerous factors for consideration regarding an offense: "(1) the means of death; (2) the manner of death (e.g., violent, tortuous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims." Id. at ___. We have also identified factors to consider regarding a particular defendant: "(1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional, or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation." Id. at __.

Here, the means of death was ligature strangulation and the manner of death, as we have held, was tortuous under the aggravating circumstance in Tenn. Code Ann. § 39-2-203(i)(5). The motivation for the killings was to rob the victims and to burglarize their home. The victim was awakened in the middle of the night, placed in a closet while her husband was strangled to death, raped twice by two perpetrators, and then herself strangled to death. There was extensive evidence that the crimes had been planned in advance, and there was no provocation or justification for the offenses. Although the defendant, who was 19 at the time of the crimes, had no criminal record, there was little evidence as to his mental, emotional or physical condition at the time of the offenses. There is no question that the defendant played the major role in the planning and executing of the offenses.

-23-

Analysis of precedent in cases involving similar murders and defendants reveals that the death penalty is not arbitrary or disproportionate. In State v. Hodges, supra, the defendant, having decided to rob the victim, bound and handcuffed the victim to a bed while he ransacked his apartment. After discussing whether to kill the victim, the defendant then strangled the victim to death. As in this case, one aggravating factor found by the jury was that the killing had been "heinous, atrocious, or cruel" because it involved torture. Although there were two other aggravating factors, there was also extensive psychological proof offered in mitigation: the defendant had an antisocial personality disorder and he had been raped as a child. We held that the penalty was not disproportionate. 944 S.W.2d at 358-59.

In State v. Brimmer, supra, the defendant handcuffed the victim to a tree and strangled him to death with a wire slipknot. He was sentenced to death solely because the killing occurred in the course of a felony. Tenn. Code Ann. § 39-2-203 (i)(7)(1982) [now Tenn. Code Ann. § 39-13-204(i)(7)(1991)]. There was substantial mitigating evidence indicating that the defendant had a borderline personality disorder, which resulted in impulsive and unpredictable behavior. We held, however, that the evidence was sufficient to find that the single aggravating factor outweighed evidence of mitigating factors and that the penalty, as applied to the defendant under the facts and circumstances of the case, was not disproportionate. 876 S.W.2d at 88.

In State v. Keen, supra, the defendant received the death penalty for raping the eight-year-old victim and then strangling her to death with a shoelace. The evidence indicated that the victim may have been unconscious in a few seconds but died in a few minutes. The jury found three aggravating factors: the victim was less than twelve years old, the killing was heinous, atrocious, or cruel, and the killing occurred during a felony. The defendant introduced evidence of his post-traumatic

stress disorder and dependant personality disorder, as well as evidence of his good behavior in prison. Although the case was remanded for resentencing on an unrelated issue, we stated that the penalty was not disproportionate as applied to the defendant. 926 S.W.2d at 743. See also State v. Caughron, 855 S.W.2d 526 (Tenn.), cert. denied, 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993)(death penalty not disproportionate applied to defendant who severely beat and strangled the victim); State v. Teel, 793 S.W.2d 236 (Tenn.), cert. denied, 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990)(death penalty not disproportionate where victim suffered "neck trauma," including possible strangulation); State v. Coe, 655 S.W.2d 903 (Tenn. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984)(death penalty not disproportionate where defendant raped, stabbed and strangled the victim).

Our precedent also reveals that the punishment in this case is not arbitrary or disproportionate merely because the defendant was 19 years of age at the time of the offenses. In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994), a 19-year-old defendant shot and killed a 74-year-old victim during a robbery. The defendant offered evidence of his good employment record and lack of a prior criminal record. As in the present case, the jury imposed the death penalty, finding that the murder was heinous, atrocious or cruel pursuant to Tenn. Code Ann. § 39-2-203(i)(5). In State v. Taylor, 771 S.W.2d 387 (Tenn. 1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 799 (1990), a 21 year old defendant assaulted the victim with a knife and the victim died from internal bleeding. The jury imposed the death penalty based on three factors, including that the murder was heinous, atrocious or cruel pursuant to Tenn. Code Ann. § 39-2-203(i)(5). In Bland, supra, the 19-year-old defendant chased, shot and killed the victim. The jury imposed the death sentence on the basis that the murder had been heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn. Code

Ann. § 39-13-204(i)(5). In each of these cases, we held that the death sentence was neither arbitrary nor disproportionate, notwithstanding the youth of the offenders.

The defendant's main contention is that his punishment was disproportionate because his co-defendant received a life sentence for the offense. A disparity in sentencing may exist if there is a rational basis for the decision of the jury to impose the death penalty on one perpetrator and not another. State v. Henley, 774 S.W.2d 908, 918 (Tenn. 1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 800 (1990); State v. Poe, 755 S.W.2d 41, 49 (Tenn. 1988), cert. denied, 490 U.S. 1085, 109 S.Ct. 2111, 104 L.Ed.2d 671 (1989); State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986), cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). Here, we said in the initial appeal of this case:

> [t]here was sufficient evidence of other factors in support of the jury's verdict to give Cauthern the death penalty and Patterson life imprisonment that would enable this Court to find that the sentence of death was not imposed on Cauthern in any arbitrary fashion, or was excessive or disproportionate to the penalty imposed in similar cases.

State v. Cauthern, 778 S.W.2d at 48 n.1. The defendant clearly was the leader in the perpetration of this crime; he knew the victims and planned the offenses. Patterson's testimony at the sentencing proceeding expressed remorse, and, unlike Cauthern's, was consistent with the version of the offenses that he gave to investigating officers. Patterson presented extensive evidence of mitigation regarding his military service, background, and family support. In sum, there was a basis for the different sentences imposed by the jury.

Similarly, there was a discernible basis for imposing a lesser sentence in the factually similar case of State v. James Lloyd Julian, II, No. 03C01-9511-CV-00371 (Tenn. Crim. App., July 24, 1997, Knoxville). There, the defendant was convicted of felony murder for strangling the victim in the course of a kidnapping and rape. The

jury, after a capital sentencing proceeding, imposed a sentence of life without parole. The defendant, unlike Cauthem in the present case, offered substantial mitigating proof in his defense. A clinical psychologist related the defendant's history of substance abuse, depressive disorder, and mixed personality disorder with borderline features. There was evidence that the defendant had been sexually abused as a child and that he had a history of violence when under the influence of alcohol and hallucinogens. This proof of mitigation evidence, as well as the factual proof of the offense, distinguishes Julian from the present case.

Although no two cases are identical, our review of the facts and circumstances of this case, as well as relevant precedent, indicates that the death penalty has been imposed in similar cases involving rapes and strangulation of the victim. Accordingly, we conclude that the death penalty is neither arbitrary nor disproportionate as applied in this case. See Tenn. Code Ann. § 39-2-206(c)(1)(1982)[now Tenn. Code Ann. § 39-13-206(c)(1)(1991 & Supp. 1996)].

## CONCLUSION

We have considered the errors claimed by the defendant and have determined beyond a reasonable doubt that none affirmatively appear to have affected the sentencing proceeding. With respect to issues not specifically addressed herein, we affirm the thorough and well-reasoned decision of the Court of Criminal Appeals, authored by Judge David H. Welles and joined in by Judge David G. Hayes and Judge Cornelia A. Clark. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence of death will be carried out as provided by law on the 23rd day of June, 1998, unless otherwise ordered by this Court, or other proper authorities.

Costs of this appeal are taxed to the defendant for which execution may issue.

-28-

_____
RILEY ANDERSON, CHIEF JUSTICE

**CONCUR:**

Drowota, Birch, and Holder, JJ.
Reid, J. - see separate Concurring Opinion



**A P P E N D I X**

# IN THE TENNESSEE COURT OF CRIMINAL APPEALS
## AT JACKSON
## JULY 1996 SESSION

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | **C.C.A. NO. 02C01-9506-CC-00164** |
| | ) | |
| VS. | ) | **GIBSON COUNTY (TRANSFERRED** |
| | ) | **FROM MONTGOMERY COUNTY)** |
| | ) | |
| **RONNIE MICHAEL CAUTHERN,** | ) | **HONORABLE DICK JERMAN, JR.** |
| | ) | |
| Appellant. | ) | (Sentencing-Death Penalty) |

For the Appellant

Hugh Reid Poland, Jr.
408 Franklin Street
Clarksville, TN 37040


Robert T. Bateman
221 South Third Street
Clarksville, TN 37040

For the Appellee

Charles W. Burson
Attorney General and Reporter
450 James Robertson Pkwy.
Nashville, TN 37243-0493

John P. Cauley
Assistant Attorney General
450 James Robertson Pkwy.
Nashville, TN 37243-0493

Clayburn Peeples
District Attorney General
109 E. First Street
Trenton, TN 38382

John Carney
District Attorney General
204 Franklin Street, Suite 200
Clarksville, TN 37040

Steve Garrett
Assistant District Attorney General
204 Franklin Street, Suite 200
Clarksville, TN 37040


OPINION FILED:  December 2, 1996

DEATH PENALTY AFFIRMED

DAVID H. WELLES
JUDGE

# OPINION

## CONSTITUTIONALITY OF THE ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATOR

Next, the appellant contends that the language of the aggravating circumstance found in Tennessee Code Annotated section 39-13-204(i)(5) is too vague to satisfy constitutional standards. This aggravating circumstance can be imposed in the death penalty context if the jury determines beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Id. Furthermore, the appellant claims the definitions of the terms in the statute given by the trial court are themselves too vague as well. The Supreme Court recently addressed this issue in Odom. The Court upheld the validity of the aggravating circumstance under constitutional attacks. See Odom, 928 S.W.2d at 25-26. Accordingly, the appellant's issue is without merit.

## ADMISSION OF THE VIDEOTAPE

The appellant claims that the trial judge abused his discretion by allowing into evidence a videotape depicting the crime scene. Specifically, the appellant argues that those segments of the tape showing the officers turning the bodies over onto their backs in order to obtain an anterior view were highly inflammatory and irrelevant. The appellant places great weight upon the fact that the original trial judge redacted from the jury's view during the guilt phase of the trial those scenes depicting the moving of the

bodies. In response, the State argues that the video was relevant to show the heinous, atrocious, or cruel nature of the crime.

The admissibility of relevant videotapes of the crime scene and victims has long been within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). See also, State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). Moreover, the recent trend is to vest more discretion in the trial judge's rulings on admissibility. See Banks, 564 S.W.2d at 949; State v. Bailey, No. 01C01-9403-CC-00105, Dickson County (Tenn. Crim. App., Nashville, July 20, 1995); perm. to appeal denied, id., (Tenn. 1996).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Along these lines, the trial court should be guided by the following matters in determining the admissibility of relevant videotape evidence: the accuracy and clarity of the video and its value as evidence; whether the video depicts the body as it was found; the adequacy of testimonial evidence in

relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions. Banks, 564 S.W.2d at 951.

Prior to the sentencing hearing on remand, the trial judge heard arguments regarding the admission of the videotape and ruled that the probative value of the evidence in regards to the aggravating factor outweighed any unfair prejudicial effect. The court also ordered that the sound be turned off so as to avoid any improper influence from the comments of the officers. See State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). The segments of the videotape at issue in this appeal deal with the camera shots of the victims. Those portions showing the general layout of the house and the evidence of the burglary, while arguably irrelevant for purposes of sentencing, are not at issue.

Both victims were found lying face down. Mr. Smith's body was wrapped in the covers kneeling against and on the bed, and Mrs. Smith's body was nude on the floor. The video shows close-ups of both victims as they were found. The video then shows the officers removing the covers from around Mr. Smith's body, turning his body onto his back, and examining his neck, arms and legs. The video zooms in on the wounds around his neck and face. Likewise, the video shows the officers removing the scarf from around Mrs. Smith's neck and flipping her body over. Again, the video zooms in on the wounds around her neck and face.

Both bodies exhibit a bluish tint to the skin and lips, as well as the effects of lividity and rigor mortis. While the appellant may be correct to argue that these postmortem features are irrelevant to any aspect of the heinous, atrocious, or cruel aggravator, the nature of the various wounds to the neck do appear relevant. Each victim was strangled with a different object, and thus received different types of strangulation marks around the neck. Moreover, as the expert testimony demonstrated, the pictures of what are probably fingernail scratches indicate that the victims attempted to free the pressure from around their necks. Because of the position in which the victims were found, it was necessary for the officers to turn the bodies over to examine the wounds to the neck. As the forensic pathologist stated, the bluish color of the skin, i.e. cyanosis, is a natural consequence of this type of killing. The stiffness of the bodies resulting from the rigor mortis is also common after death, and not in and of itself so inflammatory. See State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994). As the trial court noted, though the condition of the bodies is not pleasant by any means, it is "not so gruesome as to . . . shock the conscience of the Court or of the jury."

We believe the videos were relevant to the jury's determination of whether the murders were especially heinous, atrocious or cruel. We conclude that the probative value of the videotape outweighs any unfair prejudicial effect, and the trial judge therefore acted appropriately. Contrary to the appellant's argument, the fact that the judge on remand

allowed more of the video to be shown than did the original trial judge is irrelevant to this Court's inquiry into the issue. The original judge's ruling was based in part on showing the video during the guilt phase of the trial rather than the sentencing phase. This issue is without merit.

## EVIDENCE OF UNRELATED CRIMES

The appellant also argues that reversible error occurred when the State introduced evidence concerning a different robbery for which the appellant had been tried and acquitted. In response, the State argues the appellant has waived the issue because he permitted the introduction of the evidence and denied the court's offer of a curative instruction.

The appellant was originally indicted on eight counts in this case. Three of those charges pertained to crimes unrelated to the incident at the Smiths' residence, and they were severed from the indictment. The appellant was subsequently tried and acquitted on those three counts. Prior to the resentencing hearing, the trial judge granted the appellant's motion to keep the separate charges from the jury and warned the State that a mistrial could follow if evidence of them surfaced.

During the State's proof in the hearing, the State asked Detective Charles Denton to read one of the appellant's statements into evidence. This statement was obtained during the first interview with the appellant on January 12, 1987. The appellant objected to the introduction of this

statement because it was not a verbatim recording of the conversation between the officer and the appellant, but rather consisted of Detective Denton's annotations from the interview. The court overruled the objection and allowed the jury to review copies of the statement while the officer read it aloud on the stand. The following question and answer appear in this statement: "Question - Do you know who committed the armed robbery at the Hornbuckle 66? Answer - No." This reference was to one of the three charges on which the appellant was acquitted. After this portion of the statement was read, the appellant voiced another objection. The court informed the witness not to read one further question in the statement pertaining to the Hornbuckle robbery. The appellant, however, moved for a mistrial because the jury was in fact reading along with the officer and could see the next question: "Question - Do you know if Joe commit [sic] the burglary - robbery with Pat? Answer - I think so." The court overruled the motion for mistrial, and the following exchange occurred: "Court - What instruction do you suggest I give? . . . [Appellant's counsel] - We'll just stand on the Motion for Mistrial."

This situation is quite similar to that in State v. Smith, 893 S.W.2d 908 (Tenn. 1994). In Smith, one of the State's witnesses made reference to the defendant's prior jail time. The defendant moved for a mistrial, which the court denied. The court, however, gave the jury a curative instruction to disregard the statement and not to consider it for any purpose. Id. at 923. The Supreme Court held that it must assume the jury

followed the trial court's instruction. Id. Moreover, the Court noted that given the record as a whole in that capital case, the statement, though improper, could not have prejudicially affected the jury. Id. (citing T.R.A.P. 36(b)). Likewise, in State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992) (citing T.R.A.P. 36(b)), the Supreme Court, in considering the effect of statements concerning prior criminal activity on the jury's verdict in a capital case, stated that the admission of the evidence was harmless beyond a reasonable doubt when viewed in context of the entire record. See also State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985).

The decisions in the above-cited cases were based in part upon the appellate court's assumption that the jury obeyed the trial court's curative instruction pertaining to the inadmissible evidence. In the case at hand, the trial court gave no curative instruction. However, as the State notes, the appellant refused to entertain the trial court's offer to give such an instruction. The decisions in the above-cited opinions also relied upon the rationale of T.R.A.P. 36(b): "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." The first part of that same rule states, in pertinent part, that "Nothing in this rule shall be construed as requiring relief be granted to a party responsible

for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a).

Accordingly, although the trial court seemed willing to entertain a request for an instruction, the appellant refused to recommend an instruction and decided instead to stand on his motion for mistrial. The record indicates that the appellant also had an opportunity to review the statement before it was introduced, and did not object to the improper references.[10] We believe Rule 36(a) controls our decision here. Moreover, considering the whole record as mandated by 36(b), we find the error to be harmless beyond a reasonable doubt. The improper statements were brief, and given the context in which they were made, added no "'new dimension to the jurors' view of [the appellant]'". State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992) (quoting State v. Carter, 714 S.W.2d 241, 247-48 (Tenn. 1986)). The statements do not associate the appellant with any other criminal activity or legal proceedings. Furthermore, before the hearing, the trial judge stated that a mistrial could be warranted if any improper evidence concerning the prior acquittals were introduced. Since he overruled the appellant's motion, the judge must have been satisfied that no prejudice resulted from these improper statements. We agree. This issue, therefore, is without merit.

---

[10] The appellant objected to the introduction of the statement, but his objection was grounded upon something other than the reference to the prior acquittal; he objected because the statement was not an exact transcript of the interview which was conducted.

## ADMISSION OF TRANSCRIPT OF RECORDED STATEMENT

Next, the appellant contends it was reversible error for the trial court to allow a transcript of a tape-recorded statement into evidence when the State was unable to produce the original recording. The State argues that the original has been lost and that the transcript was properly admitted under the exception to the best evidence rule.

The evidence at issue here consists of a transcript of a tape-recorded interview between the appellant and Detectives Denton and Griffy. On the initial direct appeal of this case, the Supreme Court reversed the death penalty based upon the improper introduction of a portion of the interview. In accordance with the Supreme Court's opinion, that portion of the statement was not introduced during the hearing on remand. On remand, a redacted transcript was read into evidence which omitted any mention of Brett Patterson. As part of his complaint, the appellant argues that he was "forced into the untenable position" of subsequently having to introduce the unredacted portions of the statement which referred to Patterson's involvement.

Prior to the introduction of the transcript into evidence, there was some discussion among the parties and the judge concerning the whereabouts of the original taped recording. Apparently, the tape was lost or misplaced by the Supreme Court sometime during the prior proceedings. The trial judge made the following ruling:

All right. And, the Tennessee Supreme Court's already seen it.
It's been authenticated by the Trial Court in Montgomery
County and the Tennessee Supreme Court. I'm going to let
them read that portion which the Supreme Court said was
admissible . . . As an officer of the Court, I'm saying that [the
state] properly has this transcribed from the original tapes, and
over your objection and after noting your exception, I'm going to
allow its admission . . . It's just that the tape is now gone and
has been lost by the Tennessee Supreme Court . . . and I'm
assuming that this transcript . . . is proper.

According to the record before the Court, the transcript of the

recorded interview was authenticated and introduced during the original

trial of this case. See also State v. Cauthern, 778 S.W.2d 39, 41 (Tenn.

1989). During that trial, the trial judge ordered the State to redact those

portions of the statement that referred to Patterson before the statement

was introduced. Moreover, the trial judge on remand acknowledged the

fact that the taped recording has been lost. Rule 1004 of the Tennessee

Rules of Evidence provides that other evidence of the original recording is

admissible if the original has been lost or destroyed. Accordingly, the

introduction of the transcript was proper.

Neither is there any merit to the appellant's claim that he was

prejudiced by the introduction of both the redacted and unredacted

transcripts. The appellant seems to suggest that the evidence of the

redacted statement placed undue emphasis on his involvement in the

crimes. The trial judge, however, allowed the witness to take the stand

again and read the unredacted portions into evidence. Any harm caused

by the redacted statement, therefore, was cured by the additional evidence. Accordingly, this issue is without merit.

## NONSTATUTORY MITIGATING CIRCUMSTANCES

The appellant claims the trial judge should have instructed the jury it could consider as mitigating factors the fact that the appellant's co-defendant received a life sentence, and that the appellant has been a model prisoner and has helped others inside and outside the prison. The State argues that neither the state nor federal constitution require the judge to instruct the jury on nonstatutory mitigating circumstances.

The trial judge instructed the jury concerning the following statutory mitigating circumstances: 1) the appellant has no significant criminal history; 2) the murder was committed while the appellant was under the influence of extreme mental or emotional disturbance; 3) the youth of the appellant at the time of the crime; 4) the capacity of the appellant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense as a matter of law but which substantially affected his judgment through the ingestion of drugs; and 5) any other mitigating evidence which is raised by the evidence. The judge also instructed the jury on the following nonstatutory circumstances: 1) the appellant was an enterprising young man at the time of the crime; 2) the appellant has a minor child; and

3) the appellant is married.  The trial judge refused, however, to instruct the jury that Patterson received a life sentence, the appellant has been a model prisoner, and the appellant has helped others while in prison.

In State v. Odom, the Supreme Court recently addressed the issue of instructions on nonstatutory mitigators under the death penalty statute as amended in 1989.  Although the Court recognized that the trial court is not constitutionally mandated to instruct the jury on nonstatutory mitigating factors, the Court did construe the 1989 amendments, see Tenn. Code Ann. § 39-13-204(e)(1) (Supp. 1995), to require the judge to give the jury specifically requested instructions on mitigating circumstances that are raised by the evidence.  See Odom, 928 S.W.2d at 29-30.  In its discussion, however, the Court also acknowledged that under the law as it previously existed, see § 39-13-203(e) (1982), there was no statutory provision requiring the trial court to instruct the jury specifically on nonstatutory mitigators:

> [T]he only mandatory instructions with respect to mitigating circumstances are that those statutory circumstances which are raised by the evidence shall be expressly charged, and the jury must be told that they shall weigh and consider any other facts or circumstances that are raised by the evidence that they find to be mitigating circumstances, in making the determination of which circumstances, aggravating or mitigating, outweigh the other.

Odom, 928 S.W.2d at 29 (quoting State v. Hartman, 703 S.W.2d 106, 118 (Tenn. 1985)).  See also State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 15 (Tenn. 1993); State v. Wright, 756

S.W.2d 669, 674 (Tenn. 1988); State v. King, 718 S.W.2d 241, 249 (Tenn. 1986).

The trial judge in this case instructed the jury on the law governing mitigating circumstances as amended in 1989. See Tenn. Code Ann. § 39-13-204(e)(1) (Supp. 1995).[11] The judge also instructed the jury on three specific nonstatutory mitigating factors. As discussed previously, the general provisions of § 39-11-112 and the principles against retroactive application of statutes mandate that an offense committed under a repealed or amended law shall be prosecuted under that law, unless the new law provides for a lesser penalty. See State v. Smith, 893 S.W.2d 908, 919 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994). The amendments to those sections of the death penalty statute addressing mitigating circumstances, however, do not pertain to lesser penalties.

Accordingly, the trial judge was not compelled to instruct the jury on specific nonstatutory mitigating factors, and should have instructed the jury under the law as it existed at the time of the commission of the offense. However, because the instructions on the several nonstatutory mitigating circumstances inured to the benefit of the appellant, any errors in the trial court's actions were harmless. See supra note 3. Furthermore, because

_____

[11] Prior to the 1989 amendments, the trial court was not required to inform the jury that no distinction shall be made between statutory and specifically requested nonstatutory mitigating factors. See § 39-13-203(e) (1982). The judge here instructed the jury not to distinguish between the two types of factors. See § 39-13-204(e)(1) (Supp. 1995.).

the prior law did not require the judge to instruct on nonstatutory mitigating circumstances, the trial judge's refusal to instruct on the requested mitigating factors at issue here was proper. This issue, therefore, is without merit.

## COMPETENCY OF JUROR FOREPERSON

The appellant next contends that the juror foreperson's inability to read the verdict form without the assistance of the trial judge effectively denied him the right to an impartial jury. Specifically, the appellant suggests that since the foreperson had difficulty reading the verdict form aloud in open court, she probably encountered difficulty understanding the legal instructions contained in the written charges. The State contends that although the foreperson experienced some trouble reading the verdict form, there is no evidence in the record which indicates she could not understand the spoken word of the oral charges given by the judge.

The trial judge read the charges to the jury in open court before allowing them to retire. Once the jury returned from their deliberations, the following exchange ensued:

> THE COURT: All right. I'm going to ask you to read that for me if you will. With regard to the first count of the indictment which alleges the murder of Patrick Smith, what is your verdict?
> MS. VALERIE CLARK: Life imprisonment. We, the jury --
> THE COURT: Will you read it -- read that for me?
> MS. CLARK: We, the jury -- okay -- what's that?

-44-

THE COURT: Unanimously.

MS. CLARK: Unanimously determine that one --

THE COURT: Statutory.

MS. CLARK: Statutory.

THE COURT: Aggravating.

MS. CLARK: Aggravating --

THE COURT: Circumstances.

MS. CLARK: Circumstances has been proven by the State beyond a reasonable doubt. We, the jury, therefore, find the sentence shall be imprisonment for life.

THE COURT: And, you've each affixed your name to that. Is that right?

MS. CLARK: Right.

THE COURT: With regard to the second count of the indictment which alleges the death of Rosemary Smith, what is your verdict?

MS. CLARK: Punishment of death.

THE COURT: Will you read that for me, please?

MS. CLARK: We, the jury --

THE COURT: Unanimously.

MS. CLARK: Unanimously find that the following list -- listing --

THE COURT: Statutory.

MS. CLARK: Statutory.

THE COURT: Aggravating.

MS. CLARK: Aggravating.

THE COURT: Circumstances.

MS. CLARK: Circumstances of --

THE COURT: Do you want to list this for me? Can you read that, please?

MS. CLARK: The murder was especially human --

THE COURT: Heinous.

MS. CLARK: -- heinous --

THE COURT: Atrocious.

MS. CLARK: -- atrocious, and cruel, in that is involved --

THE COURT: Torture.

MS. CLARK: -- torture --

THE COURT: Or serious --

MS. CLARK: -- or serious physical abuse beyond that necessary to prove --

THE COURT: -- produce death.

MS. CLARK: -- produce death.

THE COURT: All right. Will you continue to read?

MS. CLARK: We, the jury --

THE COURT: Unanimously.

MS. CLARK:  -- unanimously find that the State has been proven beyond a reasonable doubt that the circumstances are--
THE COURT: Statutory.
MS. CLARK:  -- statutory --
THE COURT: Aggravating.
MS. CLARK:  -- aggravating circumstance or circumstances so to list above outweigh any other --
THE COURT: Mitigating.
MS. CLARK:  -- mitigating circumstances.  Therefore, we, the jury, unanimously find that the punishment for the defendant, Ronnie --
THE COURT: Cauthern.
MS. CLARK:  -- Cauthern shall be death.
THE COURT: Be seated please.

The Supreme Court dealt with this very issue in Kirkendoll v. State, 281 S.W.2d 243 (Tenn. 1955), a case wherein the death penalty was affirmed.  The Court held it was not error for the trial judge to accept a juror who could not read the written charges given by the court.  Id. at 255.  The Supreme Court reasoned as follows:

> We think though that other jurors if necessary could read this to that juror who could not read while in the jury room.  The purpose of having the written charge before them . . . was to prevent and keep the jury from having to keep running backward and forward into court getting the court to recharge them on various and sundry little things that they might have forgotten.  It seems to us that as long as this written charge is in the jury room that there are others there who can read that this would satisfy that question.  Consequently this assignment must be overruled.

Id.

We believe that the holding and reasoning in Kirkendoll is dispositive of the issue before us here.  The appellant has failed to point to anything in the record, apart from the difficultly in the reading of the verdict form, which

suggests Ms. Clark did not understand the oral charges given by the judge. Nor has the appellant demonstrated that he suffered any prejudice as a result of the Ms. Clark's reading skills. Accordingly, we conclude that this issue is without merit.

## INDIVIDUAL AND SEQUESTERED VOIR DIRE

Next, the appellant claims the trial court erred when it denied the appellant's motion for individual and sequestered voir dire. Specifically, the appellant contends the prospective jurors may have been aware of the facts of this case prior to the hearing. The State contends the trial court acted appropriately.

The appellant filed a pre-trial motion requesting permission to conduct individual and sequestered voir dire of the prospective jurors. The trial court denied the motion. During the voir dire, the prosecutor asked, among others, the following questions:

Have any of you heard or read anything at all about this case?

Have any of you heard anyone express an opinion about what ought to happen in this case?

There will be testimony that this crime occurred in Clarksville, Tennessee. This is a case, by the way, about two Army nurses, a husband, Patrick Smith, and his wife, Rosemary. This crime occurred either on the night of January the 8th, 1987 or the early morning hours of January the 9th. Mr. and Mrs. Smith -- Captain Smith and Captain Smith were captains in the Army -- were at home asleep when two defendants, Ronald Cauthern and another man, broke into their home, attacking both of them, raped Mrs. Smith, garroted -- that's a term you

> may not know the meaning of right now, but if you're chosen as a juror you will before this case is over -- and left them both dead. Now, have any of you ever heard anything about this fact situation?
>
> Is there anybody here who doesn't think they can give the defendant a fair trial?

The prospective jurors all responded negatively to each of these questions.

Individual and sequestered voir dire is required only when there is a "significant possibility" that the prospective jurors have been exposed to potentially prejudicial material before the trial. State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992). The decision of whether to grant individual and sequestered voir dire of prospective jurors lies within the sound discretion of the trial judge, and that decision will not be overturned absent a finding of "manifest error." Howell, 868 S.W.2d at 247-48; Harris, 839 S.W.2d at 65.

The appellant has failed to demonstrate in the case at hand any prejudice resulting from the trial court's denial of his motion. All of the prospective jurors indicated they had no knowledge of the facts or circumstances of this case. The fact that the jury knew the appellant was already convicted of first degree murder, contrary to the appellant's claim, is irrelevant to this issue. The nature of the proceedings in a capital case necessarily creates a situation where the sentencing jury will always know the guilt determination. The fact that this was a resentencing hearing does not present any substantial distinctions, especially when the jury was

unaware of the prior proceedings.  Accordingly, we find that the trial court did not abuse its discretion in denying the appellant's motion.

## MERCY INSTRUCTION

The appellant claims the trial court should have instructed the jury that it could recommend mercy when rendering its sentence.  The Supreme Court has continually upheld the trial court's decision in this respect.  See State v. Bigbee, 885 S.W.2d 797, 813-14 (Tenn 1994); State v. Cazes, 875 S.W.2d 253, 269 n.6 (Tenn. 1994); State v. Hartman, 703 S.W.2d 106, 119 (Tenn. 1985); State v. Melson, 638 S.W.2d 342, 366 (Tenn. 1982).  Accordingly, this issue is without merit.

## EVIDENCE OF THE UNDERLYING FELONIES

The appellant also alleges that the trial court erred by denying his motion to prevent the State from introducing evidence of the underlying burglary and rape.  He contends this evidence did not relate to either the aggravating or mitigating circumstances and thus was improperly before the jury.  In response, the State asserts that the trial court acted appropriately.

Prior to trial, the appellant filed a motion to prevent the State from introducing evidence of the underlying burglary and rape.  The trial judge denied the motion, stating:

This was all evidence that was originally introduced at the original trial -- at the guilt phase of the trial, and I think the jury is entitled to all the evidence from the guilt phase of the trial in making their determination as to what the proper punishment is. I think that's the law. I don't think that the rape itself could be an aggravating circumstance, but evidence of the rape could go to the proof of the aggravating circumstance that you're alleging, and for that reason that's why I'm going to allow the introduction.

In his argument before the Court, the appellant seems to suggest that the Supreme Court's holding in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992) controls this issue. Middlebrooks stands for the proposition that the State cannot rely upon the underlying felony in support of the aggravating circumstance that the murder was committed in the perpetration of a felony when the appellant was convicted of felony murder. Id. at 346. In the instant case, however, the State sought to prove the existence of only one aggravating circumstance, that the murder was heinous, atrocious, or cruel. Thus, there is no duplication problem like that encountered in Middlebrooks. Id.

Moreover, in State v. Cazes, 875 S.W.2d 253, 270 (Tenn. 1994), the Supreme Court, while conducting a Middlebrooks harmless error analysis, stated: "A sentencing jury may properly hear evidence regarding the circumstances of the offense." See also State v. Smith, 893 S.W.2d 908, 925 (Tenn. 1994). As the trial court implied, the jury must be allowed to consider the circumstances surrounding the murder in order to appropriately determine the existence of the heinous, atrocious, or cruel aggravating circumstance. The circumstances surrounding the murder

include evidence of the separate felonies. The trial court ruled, however, that the State could not inform the jury that the appellant had been convicted of burglary and rape. Because we believe the trial court acted appropriately in this regard, we find no merit to this issue.

## EXCLUSION OF PROSPECTIVE JUROR

The appellant maintains that the trial judge committed reversible error by excusing a prospective juror because of his perceived views on capital punishment. During voir dire, a prospective juror informed the prosecutor that he did not think he could "live with" the imposition of the death penalty. Subsequently, the judge asked the prospective juror if he could follow the law. He responded by stating that "the Lord makes the decision on death," and that he did not think he could impose the penalty. The judge thereafter excused the man from the jury.

The applicable standard for determining whether a juror was properly excused for cause because of his beliefs on the death penalty was delineated in Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), and is as follows: "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" See State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989) (Tennessee Supreme Court adopts Wainwright standard). Furthermore, the United States Supreme Court held that "this standard does not require that a juror's bias be proved with

'unmistakable clarity.'" Wainwright, 469 U.S. at 424, 105 S.Ct. at 852. The Court also noted that "deference must be paid to the trial judge who sees and hears the jurors." Id. at 426, 105 S.Ct. at 853.

We agree that the prospective juror's answers suggesting that he could not impose the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. at 424, 105 S.Ct. at 852. See also, State v. Smith, 893 S.W.2d 908, 915-16 (Tenn. 1994). Although this determination might not be "unmistakably clear," it need not be. Moreover, as the United States Supreme Court has held, great deference should be given to the trial judge, who is "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Wainwright, 469 U.S. at 426, 105 S.Ct. at 853. The trial judge's findings "shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that [those findings were] erroneous." State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989). The appellant has failed to meet his burden in this case.

The appellant also contends that excusing the prospective juror because of his religious beliefs further interferes with the appellant's constitutional rights. Our Supreme Court has ruled that because a juror's "'views on capital punishment may have had a religious foundation does not necessarily transform the test mandated by the United States Supreme

Court in [Wainwright v. Witt] into religious tests for . . . [constitutional purposes].'" State v. Jones, 789 S.W.2d 545, 547 (Tenn. 1990) (1990) (quoting State v. Bobo, 727 S.W.2d 945, 949 (Tenn. 1987)). Accordingly, Mr. Williams' opposition to the death penalty, though possibly based on religion, appropriately rendered him unfit as a juror. The trial judge acted properly, and this issue, therefore, is without merit.

## ADMISSION OF APPELLANT'S STATEMENTS

The appellant, relying on his brief submitted during the initial direct appeal of this case, argues that the trial court erroneously allowed the introduction of the appellant's statements into evidence. The Supreme Court previously addressed this issue on the original appeal of this case. See State v. Cauthern, 778 S.W.2d 39 (Tenn. 1989). The remand of this case was based upon the Court's determination that a portion of the appellant's statement was erroneously introduced. Id. at 47. During the resentencing hearing, the trial court followed the Supreme Court's mandate and excluded the objectionable portions of the statement. Accordingly, because the Supreme Court has already addressed this issue, the appellant's argument must fail.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Finally, the appellant asserts the death penalty is cruel and unusual punishment in violation of the state and federal constitutions. On direct

appeal, the Supreme Court rejected this argument. <u>See</u> <u>State v. Cauthern</u>, 778 S.W.2d 39, 47 (Tenn. 1989). Likewise, the Court has repeatedly upheld the constitutionality of the death penalty in the face of similar challenges. <u>See</u> <u>State v. Smith</u>, 893 S.W.2d 908 (Tenn. 1994); <u>State v. Brimmer</u>, 876 S.W.2d 75 (Tenn. 1994); <u>State v. Cazes</u>, 875 S.W.2d 253 (Tenn. 1994); <u>State v. Smith</u>, 857 S.W.2d 1 (Tenn. 1993); <u>State v. Black</u>, 815 S.W.2d 166 (Tenn. 1991); <u>State v. Boyd</u>, 797 S.W.2d 589 (Tenn. 1990); <u>State v. Teel</u>, 793 S.W.2d 236 (Tenn. 1990); <u>State v. Thompson</u>, 768 S.W.2d 239 (Tenn. 1989). Accordingly, this argument is without merit.

## CONCLUSION

After a thorough review of the issues and the record before us as mandated by Tennessee Code Annotated section 39-13-206(b) and (c), and for the reasons stated herein, we affirm the appellant's sentence of death. We conclude that the sentence was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstance, and the evidence supports the jury's finding that the aggravating circumstance outweighs any mitigating circumstances. Moreover, a comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither

excessive nor disproportionate to the penalty imposed in similar cases.[12]

Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:


_____
DAVID G. HAYES, JUDGE


_____
CORNELIA A. CLARK, SPECIAL JUDGE

---

[12] No execution date is set in this opinion. Tennessee Code Annotated section 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the sentence of death is upheld by the Supreme Court on review, that court will set the execution date.