IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 13, 2002 Session

## STATE OF TENNESSEE v. SHANNON WADE JACOBS

**Direct Appeal from the Circuit Court for Giles County**
**No. 9416     Robert L. Holloway, Judge**

---

**No. M2001-00349-CCA-R3-CD - Filed July 5, 2002**

---

Defendant was convicted of second degree murder, a Class A felony. On appeal, defendant contends that the trial court improperly excluded defendant's medical records and improperly sentenced defendant. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ALAN E. GLENN, JJ. , joined.

Keith R. Peterson, Pulaski, Tennessee, for the appellant, Shannon Wade Jacobs.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; T. Michel Bottoms, District Attorney General; Richard H. Dunavant and Patrick S. Butler, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On March 8, 2000, defendant, Shannon Wade Jacobs, was indicted by a Giles County grand jury on one count of first degree murder. The case was submitted to a jury, and defendant was subsequently found guilty of second degree murder. The trial court sentenced defendant to twenty-three years for second degree murder and ordered the sentence to be served consecutively to a two year probation revocation. Defendant subsequently filed a motion for new trial and an amended motion for new trial. The trial court denied the motion, and defendant filed his notice of appeal.

### Facts

Defendant Shannon Wade Jacobs was charged with the January 9, 2000, murder of Andre Demetrius Martin in Pulaski, Tennessee. Officer L. C. Gill, a patrolman with the Pulaski Police Department, testified that on the night of January 9, 2000, he responded to a call that shots had been fired on North Third Street. He stated that he was the first to arrive on the scene and found the victim lying beside the road and facing the roadway. The victim was struggling to breathe and was unable to communicate. He stated that he assured the victim that an ambulance was on the way. He testified that near the victim lay a small bag containing what appeared to be crack cocaine residue. He testified that after leaving the scene, he arrived at the hospital where he met his supervising officer, Lieutenant John Dickey, who instructed him to search for the vehicle believed to be driven by the suspect.

Patrolman Dwight Garner, a patrolman with the Pulaski Police Department, testified that he also answered the call of a possible shooting on North Third Street. He testified that upon his arrival, Patrolman Gill turned over a Ziplock bag containing drug residue. He stated that he secured the evidence and later turned it over to Investigator Vickie Maddox. He stated that he also recovered a spent .308 cartridge from the area. He stated that he later patrolled the city looking for a light blue, four-door Ford Tempo with the driver's window missing, which was believed to be the car driven by the suspect.

Dr. Charles Harlan, a forensic pathologist for the State of Tennessee and the assistant county medical examiner for Giles County, testified that the victim died as a result of a gunshot wound to the chest.

Robert Larry Allen testified that he was sitting in his vehicle on North Third Street talking with the victim when a car pulled up beside them. He stated that the victim started to walk over to the driver's side of the car, at which point a gun was fired. The glass shattered and the victim went flying across the road. He stated that the victim stood to his feet and fell down again. The car, a blue Ford Tempo, remained for about thirty to forty-five seconds before leaving. Allen testified that he knew defendant, and defendant was sitting in the passenger's side of the car. He also testified that he saw the rifle and saw it go off.

Cheryl Radtke testified that she had been staying at a trailer park with boyfriend Scotty Campbell, and she and Campbell were in the process of moving in with Donna Frost and defendant. Defendant was Frost's boyfriend at the time. The day of the shooting, Radtke, Frost, Campbell, and defendant went to Lawrenceburg to get a stove from Frost's mother's house and then proceeded to Frost's sister's house to get a deep freezer. She then stated that they moved the appliances out to defendant's house, after which time they took Frost to work at Pulaski Web. Radtke testified that she, Frost's two children, Campbell, Michael "PeeWee" Bryant, and defendant went to the trailer park so Campbell could get some clothes from his mother's house. She stated that at this point, Campbell was driving Frost's light blue Ford Tempo. At the trailer park, defendant left the others for a little while, then returned with Bryant, and told the others that they were going to North Third Street to purchase some crack cocaine. Radtke stated that while driving up North Third Street, they encountered the victim who sold crack cocaine to either Bryant or defendant. Radtke stated that she

did not know if the victim gave the drugs to Bryant or defendant, but she did see defendant with the money before he gave it to Bryant. She said that defendant laid the drugs on the dash of the car. Bryant was then taken home, and Radtke and defendant returned to defendant's residence. Defendant subsequently realized that the drugs were fake. At that point, Frost called and stated that she was finished with work and needed to be picked up. Radtke began to leave to pick up Frost, at which point defendant told her he was going to ride into town with her. She stated that she was driving, defendant was in the passenger's seat, and defendant had a .270 caliber deer rifle in the car. The testimony from three separate witnesses indicates that defendant kept the deer rifle with him most of the time. Radtke stated that on the way into town, defendant was saying, "I'm going to kill me a n---er . I'm going to kill me a n---er."

Radtke stated that defendant instructed her to drive down North Third Street. Instead, she drove past North Third Street and told defendant she was going to pick up Frost, at which point defendant told her, "No, you're not. Turn this car around. Turn it around now." Radtke turned around, went back, and again, did not stop. She said defendant told her to turn the car around and had his hand on the gun the whole time. They went to North Third Street a total of three times, and every time defendant kept saying, "I'm gonna kill me a n---er. I'm gonna kill me a n---er."

The two eventually saw the victim leaning over a truck and talking to someone. The victim flagged them down, and Radtke stopped the car. The gun was lying across her lap at this time. She said the last time they turned around, defendant put the gun in her lap with the barrel pointing to the driver's side door. The victim began walking towards the car, and defendant instructed Radtke to roll down the window. She stated she tried to roll down the window, but it would not roll down by itself so she had to push it down. She told defendant to wait because he had the gun up, ready to shoot. Before she could open a window, defendant shot through the window. Up to this point, the victim was saying, "No, man, no." She stated that after they drove off, defendant said, "See, I told you I was gonna shoot me a n---er."

Radtke stated that, when they picked up Frost from work, Frost wanted to know what had happened to the window, and defendant responded that he had just killed a "n---er." Frost asked why, and defendant said it was over $40.00 worth of powder cocaine. Defendant told Frost it was powder cocaine because Frost did not want defendant to be using crack cocaine. She stated that defendant told them that if they ever said anything about what happened, he would kill them all. Radtke testified that when defendant went to bed that night, Radtke called a friend and asked him to come pick her up. The friend arrived and took Radtke and Campbell back to town.

Finally, Radtke testified that, for her involvement in this matter, she was originally charged with criminal responsibility for facilitation of a felony, a Class A felony. However, she pled guilty to conspiracy to possess a Schedule II drug, a Class C felony, with a sentence of three to six years.

Investigator John Dickey testified that, at approximately 5:00 a.m. the next morning, Officer David McVeigh stopped Frost as she was driving her blue Ford Tempo. Frost and her car were then taken to the Pulaski Police Department, where she gave a statement to the police. Subsequently, the

police obtained a search warrant for defendant's residence. Defendant was not there upon arrival but was later arrested in Lewisburg and transported back to the Giles County Sheriff's Office.

Upon executing a search warrant, the officers found several .270 cartridges, but no high-powered rifles. The following morning, defendant gave a statement to Investigator Dickey and also signed a written waiver of his <u>Miranda</u> rights. He told Investigator Dickey about the events that occurred the night before and that he had the gun in his hands when the gun went off. He also told Investigator Dickey where the gun could be located. Subsequently, Investigator Dickey returned to defendant's residence and found the rifle. He testified that no fingerprints were taken from the weapon to ascertain whether defendant's prints, or any other prints, were on the weapon.

Scotty Campbell testified that at the time of the murder, he was living with Radtke, defendant, and Frost, along with Frost's two children. At the time, he and Radtke were dating, and Frost and defendant were friends. He stated that on January 9, they made plans to go to Lawrenceburg to get a refrigerator and stove for the house. They went to Lawrenceburg in Frost's blue Ford Tempo and then returned home. Subsequently, they took Frost to work. Campbell, Radtke, and defendant then went to Campbell's mother's home to get some clothes. While they were there, defendant exited the car and began looking for some crack cocaine. Campbell knew this because defendant told him that defendant had gone to Larry Allen's to look for some crack cocaine. Campbell and defendant then went to Allen's house. Defendant and Allen went to a back room and stayed for about five minutes. Campbell said that when they exited the back room, Bryant entered the house and, upon returning to the car, defendant and Bryant were talking in the middle of the road. At this point, defendant told Campbell that they were going over to the "bad side of town" because Bryant knew where they could get some crack cocaine.

Campbell stated he did not want to go, but defendant told him he had not choice but to get in the car and take him and Bryant over there. Campbell was driving the car, defendant was in the middle of the front seat, and Bryant was in the front passenger seat directing Campbell where to drive. Upon arriving at some apartments, Bryant exited the car and went to an apartment for ten or fifteen minutes. Campbell stated that Bryant returned and said that they did not have any. He also went to a different home, but no one was there. Campbell stated that defendant stayed in the car but had given money to Bryant. Campbell said they then returned to the first house and waited for someone he thought was the victim. He said that the victim came up to the car, showed them what he had, dropped it into Bryant's hand, and Bryant gave the victim the money. Defendant then told Bryant he wanted to see his "shit," and Campbell said Bryant gave it to defendant and told him that he wanted his piece for getting it. At this point, defendant gave Bryant a piece, and they left the area, dropping off Bryant.

After dropping Bryant off, Campbell, Radtke, defendant, and the two children were left in the car. They then returned home. On arrival, Frost called and stated that she was ready to be picked up from work. At this point, defendant had gone upstairs, and Campbell and Radtke were cooking dinner. Campbell stated that Radtke left to go pick up Frost from work. He stated that, as Radtke

began to leave, defendant came downstairs. Defendant was upset because the crack cocaine was fake and showed them that it was actually peanuts.

Campbell stated that defendant told him to watch the kids because defendant was going to ride into town with Radtke to pick up Frost. Campbell said it was about an hour to an hour-and-a-half before they returned. He said when they pulled up, he saw Frost sweeping glass out of the front seat of her car. Defendant was smiling and saying, "I got him. I got him." Campbell did not know who defendant was talking about, and upon questioning defendant, defendant said, "I killed me a n---er. I killed me a n---er." Campbell said defendant brought his gun into the house, and Campbell recognized it as the gun defendant carried with him all of the time. Campbell said that Radtke also said, "He's not playing, Scotty. He done it."

Donna Frost testified that at the time of the victim's death, she was living with defendant and drove a blue 1992 Ford Tempo. She stated that Radtke and defendant came to pick her up when she got off of work on January 9. Radtke was driving, and defendant was in the passenger's seat. Frost got into the back seat and noticed that the driver's side window was gone. She asked what happened, and Radtke responded, "Shannon just shot a n---er." Defendant then turned around and said, "Yeah, and if anybody snitches on me, I'll shoot them too. It don't make me no difference." Frost said that defendant told her that if she tried to leave, defendant would shoot every tire out from under the car.

Defendant testified that the shooting was an accident. He did not mean to shoot the victim. He stated that he and Radtke both had their hands on the gun at the time of the shooting and that the victim was reaching through the car door. He also said that he was intoxicated. Defendant further stated that he had taken cocaine after the shooting and before he was arrested and made the statement.

## Analysis

### I.    *Admission of Medical Records into Evidence*

Defendant contends that the trial court erred in not allowing defendant to introduce his medical records into evidence at trial. The events giving rise to the current case occurred in 2000, and the medical records defendant sought to introduce dated from 1992 to 1995. Defendant asserts that the records were admissible to show that he suffered from a mental disorder. Though defendant did not allege insanity and was not asking to use the records for a defense, counsel stated that he had not ruled out diminished capacity. Thus, he asserts that the records were admissible to negate the *mens rea* element of the crime. The trial court ruled that the records were not relevant to the instant case. In so ruling, the trial court found that the records did not constitute a defense and were not offered to prove a severe mental disease or defect to justify the defense of insanity. We agree with the trial court and affirm.

Evidence is deemed relevant if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Further, relevant evidence is generally admissible in Tennessee unless its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 402 and 403. "Since the general criminal law requires that mental state be proven by the State beyond a reasonable doubt, it is certainly a 'fact of consequence' to the outcome of a criminal prosecution. Therefore, evidence which tends to prove or disprove the required mental state is relevant and generally admissible under Tennessee law." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997).

However, the admissibility of evidence is a matter within the sound discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear showing of an abuse of that discretion. State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Abuse of discretion contemplates a situation where the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)).

The medical records in this case, though revealing that defendant suffered from a bipolar disorder between 1992 and 1995, were in no way connected with the events surrounding the shooting in 2000. Though case law allows evidence regarding a defendant's mental state at issue in a given crime, see Hall, 958 S.W.2d at 689, the trial court found these records irrelevant. We, too, believe the records were irrelevant to the issue of defendant's mental state at the time of the shooting in 2000, given the length of time between the compilation of the records and the shooting. The record reflects that the trial court held a jury-out hearing on the matter and allowed the records to be considered as an offer of proof. We see no abuse of the trial court's discretion. As such, we affirm.

*II.     Sentencing*

This Court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

If no mitigating or enhancement factors for sentencing are present, Tennessee Code Annotated section 40-35-210(c) provides that the presumptive sentence for most offenses shall be the minimum sentence within the applicable range. State v. Lavender, 967 S.W.2d 803, 806 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 788 (Tenn. Crim. App. 1991). However, if such factors do exist, a trial court should enhance the minimum sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). No particular weight for each

factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000); see Tenn. Code Ann. § 40-35-210 Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, 103, 210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In the instant case, defendant alleges that the trial court failed to properly consider the evidence in its application of the enhancing and mitigating factors. We disagree and affirm.

> The trial court found the following enhancement factors applicable to defendant's sentence:
> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
> . . . .
> (7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;
> (8) The defendant has a previous history of unwillingness to comply with the condition of a sentence involving release in the community;
> (9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; . . . [and]
> (13) The felony was committed while on any of the following forms of release status if such release is from a prior felony conviction:
> . . . (C) Probation[.]

Tenn. Code Ann. § 40-35-114.

Defendant challenges the application of enhancement factor (7). In applying factor (7), the trial court relied on trial testimony from three witnesses who stated that both before and after the shooting, defendant made statements regarding the victim, who was black. Indeed, the record does reflect testimony wherein defendant was quoted as referring to the victim as a "nigger," and defendant repeatedly stated, "I'm gonna kill me a n---er." Defendant submits that because the jury returned a verdict of second degree murder, a crime requiring a *knowing* mental state, Tennessee Code Annotated section 39-13-210(a)(1), rather than the indicted first degree intentional premeditated murder, the application of the sentencing factor is contrary to the verdict.

We agree with the trial court's imposition of this factor. The record reflects that defendant received some bad drugs from the victim and obviously became very angry. He then basically hunted down the victim, all the while touting that he was going to kill the victim, a black man. The

record also reflects that defendant acted as if he was actually proud of what he had done as he gloated over his accomplishment. The record supports the application of this factor. See State v. Strader, No. 03C01-9812-CR-00425, 1999 Tenn. Crim. App. LEXIS 1130 (Tenn. Crim. App. at Knoxville, Nov. 10, 1999) (trial court properly applied factor where defendant was involved in an argument, was angry and "willing to fight," assisted while shots were fired, hurriedly left the scene, and hid from the police).

Defendant also asserts that the trial court erred by not applying mitigation factor (9) under Tennessee Code Annotated section 40-35-113. Specifically, he contends that aiding the police in locating the weapon used in the crime was applicable to mitigate the sentence. The trial court refused to apply the factor because of what it "perceive[d] to be the motive of the defendant in giving that information to the police," during a search of defendant's residence that may or may not have revealed the weapon anyway. Defendant told the police about the weapon after telling police that the shooting was accidental.

We conclude that the trial court did not err in not applying this mitigating factor because it only relates to uncovering crimes and offenders. However, even if we were to conclude that catchall factor (13) is applicable because of his "cooperation," when viewed in light of the applicable enhancing factors, this mitigating factor is of such small value that there would be no effect on the length of defendant's sentence.

## CONCLUSION

Accordingly, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE