IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2018 Session

## STATE OF TENNESSEE v. LARRY W. HOPKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-1658    J. Randall Wyatt, Jr., Judge**

_____

### No. M2017-01962-CCA-R3-CD

_____

The Defendant, Larry W. Hopkins, was convicted by a Davidson County Criminal Court jury of two counts of aggravated rape, Class A felonies. *See* T.C.A. § 39-13-502 (2014). The trial court sentenced the Defendant to concurrent terms of twenty-five years' incarceration at 100% service. On appeal, the Defendant contends that (1) the trial court erred by limiting his cross-examination of the victim and (2) the State engaged in prosecutorial misconduct during closing argument. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and JOHN EVERETT WILLIAMS, P.J., joined.

Daniel J. Murphy (on appeal) and Kyle Parks (at trial), Nashville, Tennessee, for the appellant, Larry W. Hopkins.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn Funk, District Attorney General; and Amy M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from a May 16, 2015 incident, for which the Defendant was charged with one count of kidnapping and two counts of aggravated rape. At the January 9, 2017 trial, the victim testified that she was age thirty-three and that she previously had worked as a prostitute. The victim stated that she had been convicted of prostitution before this incident, that she had been arrested for prostitution after this incident, and that she had typically received between $120 and $200 per week for prostitution. The victim said that she slept most of the day on May 16 and that she began "standing outside" at

about 8:00 p.m. The victim stated that the Defendant's car drove by her, that she and the Defendant waved at each other, and that the Defendant turned his car around at the end of the street. The victim said that the Defendant stopped his car next to her. She said that the Defendant asked, "[W]hat are you doing," and that "I told him what I was doing and he told me to get in [the car] and we set a price arrangement." The victim stated that she and the Defendant agreed to have sexual intercourse for $20 cash.

The victim testified that she sat in the backseat of the car and that the Defendant parked the car on a secluded road about one mile away. The victim stated that she and the Defendant participated in consensual sexual intercourse in the backseat of the car and that afterward, she asked for her payment, and the Defendant refused. The victim said that she asked for the money again and that the Defendant hit her three times on the left side of her face. The victim stated that she hit the Defendant, that the Defendant apologized for hitting her, and that the Defendant hit her again. The victim said that she tried to get out of the car, that the Defendant grabbed her shirt, and that the Defendant would not let her get out of the car. The victim stated that the Defendant said, "B----, you go[ing to] tell somebody," and "I like when b------ fear me[.]"

The victim testified that the Defendant retrieved a knife and placed the knife to her throat and that he said, "You see if you don't do what I tell you to do[,] [t]his is what I am going to do to you." The victim stated that the Defendant cut her bra off of her body, that the Defendant placed his penis in her vagina, and that he inserted his finger into her anal cavity. The victim said that she did not consent to the sexual activity, that she told the Defendant "no," and that she was hysterical. The victim stated that the Defendant said he was going to kill her and that she feared for her life. The victim stated that the Defendant was positioned behind her, that the Defendant placed one of his arms around her body, that he held the knife against her throat, and that it was clear to the Defendant that she did not consent to the sexual activity. The victim said that the Defendant forced her to perform oral sex, that the Defendant held the knife against her throat, and that the Defendant said, "B----, you better do this or I'm go[ing to] kill y[ou]." The victim stated that the entire encounter with the Defendant lasted about two hours and forty-five minutes and that the Defendant forced her to perform oral sex for about forty-five minutes.

The victim testified that she saw blue lights on a police patrol car behind the Defendant's car and that the officers saved her life. The victim stated that the officers walked to the window of the Defendant's car and that the officers asked "what was going on." The victim said that she told the officers she and the Defendant were having sexual intercourse and that the Defendant said, "Shut up[,] B----." The victim stated that she told the officers "what happened," that she told the officers about their "arrangement," that she told them the Defendant cut her bra off of her body, that she described the Defendant's knife, and that she told the officers the Defendant's knife was in the back of

his car.  The victim said that she was transported to an emergency room and that a rape kit was performed.

On cross-examination, the victim testified that she had never met the Defendant before May 16, that she and the Defendant drove to the secluded road "closer to 8[:00 p.m.]," and that the Defendant initially agreed to pay her $20 cash.  The victim said that the Defendant refused to pay her after they had sexual intercourse, that the Defendant pulled a knife, that he hit her three times, that she tried to get dressed, and that he pulled off her clothes.  The victim stated that she was with the Defendant about two hours and forty-five minutes and that the police arrived at about 10:00 p.m.  The victim said that she was not concerned about being arrested when the police arrived.

The victim testified that she was placed on probation on May 7, 2015, that she was on probation at the time of the incident, and that she was using cocaine at the time.  The victim stated that she was diagnosed with bipolar disorder and depression, that she took medication for both illnesses at the time of the incident, and that officers took photographs of her face.  When asked what she was wearing when she got out of the car to speak with the police, the victim responded that she "didn't have anything on."  The victim was asked whether she was naked, and the victim said "No. I wasn't naked. . . . But I, uh, I had on my, I think I had on my underwear and bra. . . . Well I didn't have on [a] bra, so I just had on my shirt."  The victim stated that she was wearing shorts and that she was able to get dressed before speaking with the officers.  The victim said that she did not recall how long she spoke with the officers or how long the officers were at the scene before she told them about the incident.  The victim acknowledged she had two previous drug-related convictions.

Metropolitan Nashville Police Officer Paul Goebel testified that he and Officer Jarret Sonnenberg were patrolling the area and that they were looking for an area to finish their reports before their shift ended.  Officer Goebel stated that he and Officer Sonnenberg were in the same patrol car, that they drove to a secluded road, and that they noticed a parked car that "didn't appear normal."  Officer Goebel said that the road was in a quiet area, that it was a dirt road, that there were no businesses or residences in the area, and that it was unusual for a car to be parked along the road.

Officer Goebel testified that he and Officer Sonnenberg got out of the patrol car and that the Defendant got out of the parked car, attempting to pull up his pants.  Officer Goebel stated that the victim was sitting in the backseat, that the victim said she and the Defendant were having sexual intercourse, and that the Defendant said, "Shut up, B----," in a "stern tone."  Officer Goebel said that he spoke with the Defendant while Officer Sonnenberg spoke with the victim.  Officer Goebel stated that the Defendant initially said the victim was his ex-girlfriend, that the Defendant called the victim by another name to Officer Goebel, that the Defendant said he was "trying to get away from his wife for the night," and that the Defendant admitted he had sexual intercourse with the victim.

-3-

Officer Goebel said that he saw a large knife through the car's rear window and that he initially did not intend to arrest either the Defendant or the victim.

On cross-examination, Officer Goebel testified that "shift change" was at 11:00 p.m. and that it was "probably closer to 10[:00 p.m.]" when he saw the Defendant's car. Officer Goebel stated that he did not complete a report because the midnight shift officers completed the investigation. Officer Goebel said that he spoke with the victim after Officer Sonnenberg, that the victim said she and the Defendant first engaged in consensual sexual intercourse, and that the victim said after the consensual sexual intercourse concluded, the Defendant hit her in the face and would not let her out of the car. Officer Goebel stated that he told the Defendant and the victim before they were interviewed that they would not be arrested, that he did not know how long he and Officer Sonnenberg were at the scene, and that he and Officer Sonnenberg went home at the 11:00 p.m. shift change. Officer Goebel said that the victim was not wearing clothes when he first walked to the parked car, that the victim dressed before he spoke with her, and that he did not recall seeing any bruises on her face.

Metropolitan Nashville Police Officer Jarret Sonnenberg testified that he and Officer Goebel reported to a car accident on the night of May 16, that he drove the patrol car to a secluded road to finish an accident report, and that he saw a parked car as he was turning around the patrol car. Officer Sonnenberg stated that he turned on the patrol car's "spotlight," that he parked the patrol car behind the parked car, and that the rear window was "fogged up." Officer Sonnenberg said that the Defendant got out of the parked car while putting on pants, that he saw the victim in the back of the car, and that prostitution was common in the area. Officer Sonnenberg stated that the victim said she and the Defendant were having sexual intercourse and that the Defendant told her to "Shut up, B----." Officer Sonnenberg said that he interviewed the victim in the parked car and that Officer Goebel interviewed the Defendant near the patrol car.

Officer Sonnenberg testified that the victim said she and the Defendant were having sexual intercourse, that he noticed a glass pipe on the floorboard, and that a glass pipe was typically used to smoke crack cocaine. Officer Sonnenberg stated that he asked the victim if she and the Defendant had been smoking crack cocaine, that the victim admitted she had a "problem" with crack cocaine, and that he tried to keep the victim calm. Officer Sonnenberg said that the victim dressed and that he told the victim that she would not be arrested unless she had an outstanding arrest warrant. Officer Sonnenberg stated that the victim asked whether he "wanted to know the truth" and that the victim said the Defendant raped her. Officer Sonnenberg said that the victim stated she and the Defendant participated in consensual sexual intercourse, that the Defendant would not let her out of the car after the intercourse concluded, that the Defendant hit the victim in the face, and that the Defendant "pull[ed] a knife out."

Officer Sonnenberg testified that he spoke with Officer Goebel, that Officer Goebel interviewed the victim while he interviewed the Defendant, and that he tried to keep the Defendant calm. Officer Sonnenberg stated that Officer Goebel "ran" the Defendant's and the victim's driver's licenses and that he spoke with the victim a second time. Officer Sonnenberg stated that the victim said the Defendant had cut off her bra, that he found the bra in the car's floorboard, and that the bra appeared to have been cut. Officer Sonnenberg said that the victim described the knife the Defendant used, that he found one knife in the driver's door, and that the knife did not match the victim's description. Officer Sonnenberg stated that he found a second knife in the back of the car near the rear window and that the knife matched the victim's description.

On cross-examination, Officer Sonnenberg testified that the victim said she was raped before he checked for outstanding arrest warrants and that the victim appeared "upset." Officer Sonnenberg stated that he and Officer Goebel saw the Defendant's car between 10:00 and 11:00 p.m. and that between five and seven minutes passed during his conversation with the victim before she claimed she was raped.

Pam Crues, an expert in sexual assault examinations, testified that she conducted a sexual assault examination on the victim. Ms. Crues stated that the victim provided a "brief description" of the incident, which was reflected in Ms. Crues's report. The report was received as an exhibit, and Ms. Crues read the victim's description of the incident to the jury. Ms. Crues read:

> He was a John and he flipped out. He hit me in the face three times. I stayed back there two hours and he raped me. He pulled out a knife and he said, "B---- I will kill you." The knife was almost seven inches. He made me suck his penis. He put it in my vagina. He tried to go in my butt.

Ms. Crues stated that the victim had a small bruise on her left check and had an "abrasion like a scratch" in the area between the rectum and vagina, which was typical for sexual assault victims. Ms. Crues stated that the victim also had "small abrasions . . . around her anus."

On cross-examination, Ms. Crues testified that the victim reported having consensual sexual intercourse with her fiancé two weeks before the incident and with four people the night before the incident and that it was possible the victim suffered her injuries during consensual sexual intercourse. Ms. Crues stated that she collected a blood sample and administered a urinalysis and that cocaine was present in the victim's system.

Metropolitan Nashville Police Officer Wallis Massey testified that he responded to the scene and that Officers Goebel and Sonnenberg were present. Officer Massey stated that the Defendant was seated in the back of a patrol car and that he spoke with the victim. Officer Massey stated the victim admitted that she was a prostitute and that she

and the Defendant had engaged in consensual sexual activity.  Officer Massey said that the victim said the Defendant refused to pay her after the consensual sexual intercourse, that the Defendant grabbed a knife, and that the Defendant would not let her out of the car.  Officer Massey stated that the victim said the Defendant hit her twice on the left side of her face and raped her.  Officer Massey said that the victim appeared "relaxed" and relieved.  Officer Massey stated that the victim described the Defendant's knife as "scary looking" with a hollow blade.  Officer Massey said that the victim said the knife was in the back of the car and that he saw a knife in the back of the car that matched the victim's description.

On cross-examination, Officer Massey testified that his incident report showed that the victim told Officers Goebel and Sonnenberg that the Defendant was her boyfriend and that the Defendant said the victim was his girlfriend.  Officer Massey stated that the victim did not report to him that the Defendant forced her to perform oral sex.

Metropolitan Nashville Police Department Detective Casey Stupka testified that she responded to the scene, that the Defendant sat in the back of a patrol car, and that she spoke with the Defendant.  An audio recording of a conversation between Detective Stupka and the Defendant was received as an exhibit and played for the jury.  The recording reflected that Detective Stupka asked the Defendant whether he was willing to speak with her and that the Defendant said, "I haven't done anything except have sex with a girl in the back seat of my car."

Detective Stupka testified that she spoke with the victim, that the victim said she and the Defendant agreed to consensual sexual activity in an exchange for $20 cash, and that the Defendant drove the victim to a secluded area.  Detective Stupka stated that when the consensual sexual activity concluded, the Defendant refused to pay her, would not let her out of the car, and hit her twice in the face.  Detective Stupka stated that the victim said the Defendant retrieved a knife, "held it to" her throat, and cut her bra from her body.  Detective Stupka stated that the victim said the Defendant forced her to perform oral sex, raped her, and made threatening comments.

Detective Stupka testified that she did not see any signs of an injury to the victim's face when she spoke with her and that a rape kit was performed but that the results were not known at the time of the trial.  Detective Stupka stated that she obtained a search warrant for the Defendant's car, that she retrieved a knife from the back of the car, and that the victim's bra had been cut.  Detective Stupka said that the victim had been arrested on multiple occasions for prostitution, that the victim had been previously convicted of prostitution, and that the victim never previously accused anyone of raping her according to court documents.

Metropolitan Nashville Police Crime Scene Investigator Arthur Hipp testified for the defense that he went to the scene, that other officers were already present, and that Officers Goebel and Sonnenberg were not at the scene when he arrived. Investigator Hipp stated that his report showed that the victim initially told Officers Goebel and Sonnenberg that the Defendant was her boyfriend. On cross-examination, Investigator Hipp testified that he went to the scene to take photographs and to "document the scene," that neither the victim nor the Defendant was at the scene when he arrived, and that he received information about the incident from a fellow officer.

Wayne Miller testified that he worked in the Davidson County Sheriff's records office. A copy of a "money record receipt" was received as an exhibit. Mr. Miller stated that a money record was created when an inmate went through the booking process, that the record showed how much money an inmate possessed at the time of booking, and that the Defendant possessed $40 when he was booked.

Upon this evidence, the Defendant was found not guilty of kidnapping and was convicted of two counts of aggravated rape. This appeal followed.

## I. Cross-Examination

The Defendant contends that the trial court erred by limiting his cross-examination of the victim relative to the timeline of the incident. The State responds that the Defendant has waived appellate review because he failed to raise this issue in his motion for a new trial. In the alternative, the State argues that the Defendant is not entitled to plain error relief.

The record reflects that the Defendant failed to make a contemporaneous objection during the trial and failed to raise this issue in his motion for a new trial. *See* T.R.A.P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . misconduct of . . . parties or counsel . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Moreover, we are not compelled by the facts of the case to consider the matter as one of plain error. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The Defendant is not entitled to relief on this basis.

## II. Closing Argument

The Defendant contends that prosecutorial misconduct occurred when the Assistant District Attorney General commented on the Defendant's failure to testify during her rebuttal argument. The State responds that the Defendant has waived appellate review because he failed to raise this issue in his motion for a new trial and that the Defendant is not entitled to plain error relief.

The record reflects that the Defendant objected after the State's rebuttal argument and that his objection was overruled. However, the Defendant failed to raise this issue in his motion for a new trial. *See* T.R.A.P. 3(e). Our review is limited to plain error. *See Adkisson*, 899 S.W.2d at 641-42.

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42.) All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235

(Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014). Both direct and indirect references on a defendant's right to testify can violate the Fifth Amendment. *See State v. Mario Donte Keene*, E2017-00316-CCA-R3-CD, 2018 WL 389213 at *19 (Tenn. Crim. App. Jan. 12, 2018). Our supreme court has held that when determining whether a defendant's right not to testify was implicated, we must determine (1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the

prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify. *Jackson*, 444 S.W.3d at 588.

The record reflects the following during trial counsel's closing argument:

> In the State's closing[,] they initially said that this case was easy, that it was open and shut, and that if you just listen to what you heard there is no way to find anything but guilty. We obviously argue to differ and say that this case is far from simple in that you have a pretty hefty burden of deciding who you are going to believe is giving correct testimony.
>
> . . .
>
> The Judge will also instruct you and tell you about [the Defendant] not having to testify. I understand that that is always strange or weird because you think, well, why wouldn't he just say something; why wouldn't he just let me know what happened or his version of events?
>
> If you are thinking right now that if only I had heard from [the Defendant] I would feel much better about making a decision in this case then you have to find him not guilty, because you will be told that you cannot equate any of your deliberation on the fact that he did not testify and if you feel that something is missing or that something is not as it should be then right now you know that the burden has not been met.

On rebuttal, the State argued:

> [Trial counsel] said during his closing argument that you have to decide who to believe. Members of the jury, the only person who was there that night that you have testimony from in this court for you to consider is her, it is [the victim].
>
> You don't have to choose who you are going to believe. The rules that the Judge is about to read to you that include the instruction on credibility of a witness will tell you that all witnesses who testify, every single witness who testifies from that stand, all witnesses are presumed to be truthful, just like the [D]efendant has a presumption of innocence until the State brings its case, all of the witnesses have a presumption that what they are saying is truthful and there has been no, no evidence to combat what she said as not being truthful.
>
> . . .

Okay. Here is something else really important that I want to talk about that [trial counsel] said during this closing argument[]. He said if right now you were wishing, man, I wish I would have heard from [the Defendant], that that means that there is reasonable doubt in this case. That is just flat out not true.

That is just flat out not true. What that is is flat out human nature, wishing that you heard from him, and against the Rule because the Judge is going to tell you that you are not allowed to think that, but that does not mean, that absolutely does not mean that there is reasonable doubt in this case. It means that you are breaking the rules.

We conclude that the Defendant has failed to prove that a clear and unequivocal rule of law was breached. *See Adkisson*, 899 S.W.2d at 640-41. The prosecutor did not directly comment on the Defendant's right not to testify, and the remark was not of such character that the jury would "necessarily" have taken it to be a comment on the Defendant's failure to testify. *See Jackson*, 444 S.W.3d at 588. The Defendant's trial strategy was to the challenge the victim's credibility, and this strategy continued during trial counsel's closing argument. When viewed in the context of closing argument, the prosecutor's remark in rebuttal argument was in response to trial counsel's argument and addressed the victim's credibility. Furthermore, the prosecutor later told the jury that it would be "breaking the rules" if it considered the fact that the Defendant failed to testify during its deliberations. The Defendant is not entitled to plain error relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-11-