IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2025 Session

## STATE OF TENNESSEE v. MICHAEL CHRISTOPHER SIMONDS

**Appeal from the Circuit Court for Anderson County**
**No. B9C00038    Ryan M. Spitzer, Judge**
_____

**No. E2024-00190-CCA-R3-CD**
_____

An Anderson County jury convicted Defendant, Michael Christopher Simonds, of attempted aggravated rape. The trial court imposed an effective sentence of eleven years' confinement. On appeal, Defendant contends that that the evidence was insufficient to sustain his conviction and that the State made improper comments in its closing argument. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., and W. MARK WARD, Sp. J., joined.

M. Todd Ridley, Assistant Public Defender – Appellate Division, Franklin, Tennessee (on appeal); Ann Coria, District Public Defender; and Nancy Meyer, (at trial) Assistant Public Defender, Clinton, Tennessee for the appellant, Michael Christopher Simonds.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Dave Clark, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural and Factual Summary

On May 7, 2019, the Anderson County Grand Jury returned a three-count indictment charging Defendant with especially aggravated kidnapping (Count 1), attempted aggravated rape (Count 2), and aggravated kidnapping (Count 3). Defendant proceeded to trial in June 2022.

From the evidence presented at trial, on the night of July 6, 2018, at approximately 9:00 p.m., the victim was finishing her shift at the restaurant where she worked in Anderson County, Tennessee. The restaurant was owned by Cinnamon Kennedy, Defendant's sister. The victim testified that she had known Defendant, who was a family friend, for almost six years at the time of the incident.

After closing the restaurant, the victim recognized that Defendant was planning on walking home and offered to give him a ride in her vehicle. Defendant agreed, and the two left the restaurant a few minutes after 9:00 p.m. On the way to Defendant's home, the victim picked up her minor son, J.J.,[1] who was at a friend's house. Defendant rode in the front passenger seat, and J.J. was in the back of the vehicle.

Upon arriving at Defendant's home, Defendant exited the vehicle to open the gate in front of the property so the victim could pull into the driveway and turn her vehicle around. Next to the home was "a little camper-type thing." Defendant told the victim that he was staying in the camper. The victim parked her vehicle "about six to eight feet from the camper." Before the victim could leave, however, Defendant asked her to hold a flashlight for him so he could "plug in electricity into the camper." The victim agreed and entered the camper with Defendant while J.J. remained in the vehicle.

Inside the camper, Defendant was positioned between the victim and the door. Defendant bent over and then stood up holding a long knife. Defendant pushed the knife against the victim's neck just under her chin and told her to "take off [her] clothes and [lie] down." The victim told Defendant, "I can't do that . . . my son is just right there." The victim testified that she "just started trying to talk to [Defendant] and reason with him and try to figure out . . . what was going on." Defendant continued to press the knife into the victim's neck and told her repeatedly, "I have a knife . . . this is going to happen . . . this is happening, this is going to happen."

The victim struggled with Defendant and tried to get away from him. She reminded him about the relationship between their families, urging him to "think about [his] dad and [his] mom . . . and sister" with whom she had worked. She further appealed to Defendant to think "about his children and his granddaughter that had just been born recently." Defendant ignored her appeals and proceeded to try to tie her hands together with zip ties. The victim was able to prevent her hands from being bound by her continued efforts to escape. She testified that she was "fighting with everything that I could physically to try to get away and get back to my son." She stated that she was not screaming because she was "just in shock over what was happening," and "just didn't even know what to think."

---

[1] Because it is the policy of this court to protect the identity of witnesses who are minors, we will refer to the victim's son by his initials.

The victim testified that she was afraid that Defendant was going to rape her. She recalled that she was "trying to appeal to him and his feelings for his family" and told him, "you are like a brother, I love you like a brother." After the victim's final plea, Defendant put his hands around her throat and began choking her. The victim testified that she believed that she lost consciousness. She remembered Defendant putting a pillow and blanket over her face. Though she could not tell if Defendant was lying on her or pushing her, the victim noted that she felt a weight on her and that she "couldn't breathe at all."

The victim testified that the struggle with Defendant continued for approximately ten to fifteen minutes. At some point, the victim heard her son call out to her. In response, the victim started "yelling for him to call 911" and "told him that [she] was being attacked." Defendant in turn stopped his attack and ran out of the camper. The victim was then able to flee from the camper and get into her vehicle with her son.

Once in her vehicle, the victim had difficulty backing the car out of the property because she had lost her glasses during Defendant's attack. As a result, the victim drove off the driveway into a ditch. While on the phone with 911, the victim identified Defendant as her attacker and stated that he had choked her, tried to kill her, and tried to rape her.

At the time of the incident, Chris Paul was working as a deputy with the Anderson County Sheriff's Office. Deputy Paul responded to the victim's 911 call. Upon arriving, Deputy Paul found the victim and her son in their vehicle which was stuck in a ditch. Deputy Paul described the victim as "extremely distraught" and "very upset."

Deputy Paul searched the property for Defendant but was unable to locate him. He was, however, able to find the knife that Defendant had used in the attack. Deputy Paul took photographs to document the injuries to the victim's neck.

J.J. testified that on the night of the incident, the victim picked him up from a friend's house. Defendant was already in the vehicle, and J.J. understood that the victim was giving Defendant a ride home. At Defendant's home, J.J. waited in the vehicle and played a game on his phone while the victim went inside the trailer to help Defendant. After about fifteen minutes, J.J. grew suspicious and called out to the victim. At that point, the victim yelled out to him to call 911 and said that she was being attacked. When the victim got into the vehicle, J.J. recalled that she "looked traumatized like something terrible had just happened."

Darlene Simonds, Defendant's mother, testified on behalf of Defendant. Ms. Simonds claimed that the victim was resentful about working with her because Ms. Simonds told the victim that she could not bring her children to work. Ms. Simonds

- 3 -

confirmed that that electrical power box to the camper was located on the outside of the camper, not the inside.

During closing arguments, the prosecutor stated the following:

> None of us know the evil that some men possess in their heart. There is no way we can know that by looking at them. There is no way we can know that by engaging. But we all know that there is evil in this world and some men have evil in their heart. And [Defendant] has that evil and he displayed it on that July 6th night of 2018.

Defendant objected to this line of the State's argument; however, the trial court overruled the objection.

At the conclusion of the trial, the jury convicted Defendant of Count 2, attempted aggravated rape. The jury acquitted Defendant of Counts 1 and 3, especially aggravated kidnapping and aggravated kidnapping.

The trial court imposed an effective sentence of eleven years' confinement as a standard offender.[2] Defendant filed a motion for new trial, which the trial court denied following a hearing. Defendant then filed a timely notice of appeal.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant contends the evidence produced at trial was insufficient for the jury to find him guilty of attempted aggravated rape beyond a reasonable doubt. The State responds that the evidence was sufficient to sustain Defendant's conviction. We agree with the State.

### 1. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13. "This standard of review is identical

---

[2] Defendant raises no sentencing issues on appeal.

whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

## 2. Attempted Aggravated Rape

As applicable to the instant case, aggravated rape "is unlawful sexual penetration of a victim by the defendant" where "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon." Tenn. Code Ann. § 39-13-502(a)(1). In their briefs, the parties agree that a person commits criminal attempt of an offense when, acting with the kind of culpability otherwise required for the offense:

> Acts with intent to complete a course of action or cause a result that would constitute the offense under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3).

When viewed in the light most favorable to the State, the evidence establishes that Defendant requested that the victim accompany him inside his camper purportedly to help connect the camper to electricity. Defendant made this request despite the camper's electrical connection being on the outside of the camper. Once inside, Defendant positioned himself between the victim and the door. Defendant produced a long knife that he pushed against the victim's neck and told the victim to "take off [her] clothes and [lie] down." The victim refused and struggled with Defendant. When the victim sought to reason with him, Defendant told her repeatedly, "I have a knife . . . this is going to happen

- 5 -

. . . this is happening, this is going to happen." The victim continued to struggle with Defendant, and Defendant attempted to bind her hands with zip ties. Even though the victim appealed to Defendant that she loved him "like a brother," Defendant put his hands around her throat and began choking the victim to the point she lost consciousness. Defendant then put a pillow and blanket over the victim's face, pressed his weight against the victim until she "couldn't breathe at all." The victim testified that she was afraid Defendant was going to rape her.

Further, when the victim's son called out to her and she told him to call 911, Defendant stopped his attack and fled. Once the victim was able to reach her vehicle, she told the 911 operator that Defendant had attacked her and stated that he had choked her, tried to kill her, and tried to rape her.

Defendant argues that there was no proof suggesting that he took a substantial step toward the commission of aggravated rape and that he had the specific intent to commit aggravated rape. While Defendant concedes that "there was certainly evidence of an assault," he argues there is a lack of evidence upon which a juror could conclude Defendant intended to commit a rape, rather than an assault or some other offense. In his view, the only evidence that supports aggravated rape is the victim's subjective impression of Defendant's intent. Defendant contends the proof falls short of other cases in which Tennessee courts concluded that the evidence was sufficient to sustain an attempted statutory or aggravated rape conviction. *See e.g. State v. Fowler*, 3 S.W.3d 910 (Tenn. 1999); *State v. Bullard*, No. M2008-01148-CCA-R3-CD, 2009 WL 1812420 (Tenn. Crim. App. June 25, 2009), *no perm. app. filed*.

In *Fowler*, our supreme court held that a defendant had taken a "substantial step" toward committing statutory rape for the purposes of criminal attempt, when he paid an undercover police officer to deliver a young male for sex, despite never actually taking possession of the young male or initiating sex. 3 S.W.3d at 312. In *Bullard*, this court concluded there was sufficient evidence of the defendant's specific intent to commit aggravated rape where he beat and humiliated the victim, "removed all of his clothes and stood in the bathtub . . . [and] ordered that [the victim] remove her clothes . . . and join him in the shower." 2009 WL 1812420, at \*7. While direct proof of the defendant's intent was not established, we concluded "any rational jury could have excluded any other reasonable hypothesis and found beyond a reasonable doubt that the [d]efendant intended to rape the victim." *Id.* (internal quotation and citation omitted). Defendant argues "unlike *Bullard* and *Fowler*, there is scant evidence that [Defendant] intended to rape [the victim]."

We disagree with Defendant's contention. The evidence presented at trial established that Defendant, after luring the victim into the camper—under the false pretenses of needing help connecting the electricity—pushed a knife against the victim's

throat and ordered her to remove her clothes. When the victim refused Defendant's order, he repeated, "I have a knife . . . this is going to happen . . . this is happening, this is going to happen." As in *Bullard*, under these circumstances "any rational jury could have excluded any other reasonable hypothesis" of what Defendant's statements meant or what he intended to do. *Id.* In other words, the jury could find that when Defendant said "this is going to happen," he meant rape. Under the strongest view of the proof that the law requires, there is sufficient evidence to support the jury's conclusion that Defendant had the specific intent to rape the victim and took a substantial step toward the commission of the offense. Accordingly, we conclude that the evidence is sufficient to establish that Defendant intended to commit aggravated rape and took a substantial step in doing so. Defendant is not entitled to relief on this issue.

## B. State's Closing Argument

Defendant argues that his conviction should be reversed because the State improperly argued he had "evil in his heart" in its closing argument. The State responds that the argument was not improper, and, even if improper, did not rise to the level of reversible error. We agree with the State.

Closing arguments are intended "to sharpen and to clarify the issues that must be resolved in a criminal case." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Prosecutors "may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *Id.* at 131 (internal citations omitted). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Id.* Rather, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper" that the argument "affected the outcome of the trial to the defendant's prejudice." *Id.*; *see also Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). Tennessee courts consider the following factors in determining whether a defendant was prejudiced by improper statements from the State:

> (1) the conduct complained of viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

Defendant argues that the State's comments that Defendant had "evil in his heart" was objectively improper. In his brief and at oral argument, Defendant contended that the present case is "remarkably similar" to *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). There, the defendant was charged with felony murder. *Id.* at 726. In closing argument, the prosecutor read from the Lord's Prayer and quoted a song from the Rolling Stones' song "Sympathy for the Devil" to argue for the existence of "the evil one." *Id.* at 736. The prosecutor continued, stating that "the evil one is smart, the evil one is skilled, the evil one is wily, and the evil one is manipulative." *Id.* The prosecutor said that the defendant effectively embodied "the evil one" when he "appeared at the door" of the victim's house on the day of the murder and admonished the jury to "combat and destroy" such evil in their role as jurors. *Id.*

Our supreme court held such argument was "patently improper." *Id.* at 737. In its analysis, the court focused on the State's impermissible use of biblical passages, its use of "the evil one" as an epithet to characterize the defendant, its appeal that the jury send a message of general deterrence with their verdict, and the suggestion that the defendant should be punished for other acts committed by "the evil one." *Id.* at 737-38. However, when considering the *Judge* factors, the court held that the argument did not render the jury's decision so unreliable as to merit reversal. *Id.* at 738.

We conclude the State's use of "evil" in this case differs from the drawn-out and repeated use of the word in *Cauthern*. Here, the State used the word "evil" as an adjective to describe Defendant's intent. In Count 2, Defendant was charged with criminal attempt, which is a specific intent crime. And as provided in the jury instructions, the State had to show "that [Defendant] intended to commit the specific offense of [] aggravated rape . . . Intent means that a person acts intentionally with respect to the nature of the conduct . . . when it is the persons conscious objective . . . to engage in the conduct." Because intent can rarely be shown by direct proof, the State may demonstrate intent from the surrounding facts and circumstances. *See State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Using emotive language in closing arguments is a tool that allows the State to summarize its arguments and highlight a defendant's intent, as inferred from the facts of the case.

Emotive language is not foreign to legal discourse in Tennessee. Words like heinous ("grossly wicked or reprehensible; abominable; odious; vile"), atrocious ("extremely evil or cruel"), and cruel ("disposed to inflict pain or suffering") are a part of the lexicon used by the courts and legal practitioners to guide jurors and to characterize the severity of a defendant's action in a way that reflects societal values and ethical considerations. *See e.g.* T.P.I.—Crim. 6.02, 7.04(a), 21.03(b) (28th ed. 2024); *see also State v. Gilliland*, 22 S.W.3d 266, 275 (Tenn. 2000) ("In ascertaining the intent of the legislature, this Court may look to the language of the statute, its subject matter, the object and reach of the statute, the *wrong or evil* which it seeks to remedy or prevent, and the purpose sought

to be accomplished in its enactment.") (emphasis added) (internal quotation and citation omitted). While the connotative force of the word "evil" is strong, *Cauthern* did not outright proscribe its use, and its appearance here does not raise the same concerns of impropriety.

Assuming, *arguendo*, the State's argument was improper, application of the *Judge* factors establish that the argument did not affect the verdict to Defendant's prejudice. *See Judge*, 539 S.W.2d at 344. The State's use of the word "evil," and intent therein, was a limited characterization of Defendant's intent and mental state. The jury had to decide Defendant's intent as an element of Count 2, and the argument was akin to stating Defendant had ill intent when he lured the victim into the camper under false pretenses in order to rape her. Further, Defendant was acquitted of especially aggravated and aggravated kidnapping, and this suggests the jury was not swayed merely by the State's use of strong language in closing arguments. The trial court instructed the jury that "closing arguments are not evidence," but rather the parties' summaries of the case intended to help the jury understand the evidence presented. The jury is presumed to follow the trial court's instructions. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). Finally, we conclude that the evidence of Defendant's guilt was strong, and the cumulative effect of the alleged improper argument did not prejudice Defendant. Accordingly, Defendant is not entitled to relief on this issue.

## III. Conclusion

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE

- 9 -